# EXHIBIT A

# EXHIBIT 1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS
## SEX CRIMES DIVISION

| | |
|---|---|
| JACKIE LACEY • District Attorney | DAVID E. DEMERJIAN • Director |
| SHARON J. MATSUMOTO • Chief Deputy District Attorney | |
| JOSEPH P. ESPOSITO • Assistant District Attorney | |

September 23, 2013

Los Angeles Police Department
Fugitive Warrant Detail
100 W.1st Street, 4th Floor
Los Angeles, CA 90012

Re:   **Rodriguez, Juan E.**
       **DR No. 00-1119771**
       **Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in future litigation.

Very truly yours,

JACKIE LACEY
District Attorney

By

VICTOR RODRIGUEZ, Asst. Head Deputy
Sex Crimes Division

bl

777 Hall of Records
320 West Temple Street
Los Angeles, CA 90012
(213) 974-1611
**LADA 001**



**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

October 10, 2012

Los Angeles Police Department
Fugitive Warrant Section
100 W. 1st Street, 4th Floor
Los Angeles, CA 90012

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

VICTOR RODRIGUEZ, Asst. Head Deputy
Sex Crimes Division

bl

18-205 Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA 90012
(213) 974-3881
**LADA 002**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS

STEVE COOLEY • District Attorney                              RICHARD DOYLE • Director
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

November 10, 2011

Los Angeles Police Department
Fugitive Warrant Section
100 W. 1st Street, 4th Floor
Los Angeles, CA 90012

**Re: Rodriguez, Juan E.**
     **DR No. 00-1119771**
     **Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By _Victor Ro_

VICTOR RODRIGUEZ, Asst. Head Deputy
Sex Crimes Division

bl

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

May 3, 2011

Los Angeles Police Department
Fugitive Warrant Section
100 W. 1st Street, 4th Floor
Los Angeles, CA 90012

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

VICTOR RODRIGUEZ, Asst. Head Deputy
Sex Crimes Division

bl

18-205 Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA  90012
(213) 974-3881

**LADA 004**




**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS

STEVE COOLEY • District Attorney                          RICHARD DOYLE • Director
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

February 25, 2010

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5ᵗʰ Floor
Los Angeles, CA 90015

**Re: Rodriguez, Juan E.**
    **DR No. 00-1119771**
    **Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

TERESA GOMEZ, Asst. Head Deputy
Sex Crimes Division

bl

18-205 Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA 90012
(213) 974-3881

**LADA 005**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

September 14, 2009

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, CA 90015

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

TERESA GOMEZ, Asst. Head Deputy
Sex Crimes Division

bl

18-205 Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA 90012
(213) 974-3881

**LADA 006**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

February 4, 2009

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, CA 90015

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

TERESA GOMEZ, Asst. Head Deputy
Sex Crimes Division

bl

18-205 Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA 90012
(213) 974-3881
**LADA 007**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

August 6, 2008

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, CA 90015

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

TERESA GOMEZ, Asst. Head Deputy
Sex Crimes Division

bl

18-205 Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA 90012
(213) 974-3881

**LADA 008**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
BUREAU OF SPECIALIZED PROSECUTIONS
SEX CRIMES DIVISION

---

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

March 7, 2008

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, California 90015

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By _Teresa Gomez_

TERESA GOMEZ
Assistant Head Deputy
Sex Crimes Division

jk

740 Hall of Records
320 West Temple Street
Los Angeles, CA 90012
(213) 974-1611

**LADA 009**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS
### SEX CRIMES DIVISION

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

August 28, 2007

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, California 90015

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By *Teresa E. Gomez*

TERESA GOMEZ
Assistant Head Deputy
Sex Crimes Division

jk

740 Hall of Records
320 West Temple Street
Los Angeles, CA 90012
(213) 974-1611

**LADA 025**



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS
## SEX CRIMES DIVISION

STEVE COOLEY ● District Attorney
JOHN K. SPILLANE ● Chief Deputy District Attorney
CURTIS A. HAZELL ● Assistant District Attorney

RICHARD DOYLE ● Director

March 16, 2007

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, California 90015

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By *[signature]*

TERESA GOMEZ
Assistant Head Deputy
Sex Crimes Division

jk

740 Hall of Records
320 West Temple Street
Los Angeles, CA 90012
(213) 974-1611

**LADA 026**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS
## SEX CRIMES DIVISION

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURTIS A. HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

September 12, 2006

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, California  90015

**Re: Rodriguez, Juan E.**
**DR No. 00-1119771**
**Warrant No. LAC BA214857 01**

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

TERESA GOMEZ
Assistant Head Deputy
Sex Crimes Division

jk

740 Hall of Records
320 West Temple Street
Los Angeles, CA  90012
(213) 974-1611

LADA 027



**LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE**
BUREAU OF SPECIALIZED PROSECUTIONS
SEX CRIMES DIVISION

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
CURT HAZELL • Assistant District Attorney

RICHARD DOYLE • Director

March 9, 2006

Los Angeles Police Department
Fugitive Warrant Section
1149 South Broadway, 5th Floor
Los Angeles, California 90015

Re: *People v. Juan E. Rodriguez*
 Case No. BA214857
 DR No. 00-1119771

This letter is to remind you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, we request that you make a diligent effort to locate the defendant and serve the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By *Jerre E. Gr...*

TERESA GOMEZ
Assistant Head Deputy
Sex Crimes Division

jk

740 Hall of Records
320 West Temple Street
Los Angeles, CA 90012
(213) 974-1611



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF SPECIALIZED PROSECUTIONS
## SEX CRIMES DIVISION

STEVE COOLEY ● District Attorney
CURT LIVESAY ● Chief Deputy District Attorney
CURTIS A. HAZELL ● Assistant District Attorney

JANET S. MOORE ● Director

September 24, 2004

Los Angeles Police Department
Abused Child Unit
150 N. Los Angeles Street, Room 129
Los Angeles, California 90012

Attention: Detective Sweeney

In re: <u>People v. Juan Esteban Rodriguez</u>
      Case No.: BA214857
      DR No.   00-1119771/774

This letter is to inform you that felony charges are pending against the above-named defendant and a warrant has been issued for his arrest which, according to our records, has not yet been served.

In order that the prosecution of this case not be jeopardized by an undue passage of time, you are requested to make a diligent effort to locate the defendant and served the outstanding warrant so that we may expeditiously continue our prosecution.

We suggest that you keep written records of your efforts to locate this defendant in the event that this issue arises in the future litigation.

Very truly yours,

STEVE COOLEY
District Attorney

By

LYDIA BODIN, Assistant Head Deputy
Sex Crimes Division

bl

777 Hall of Records
320 West Temple Street
Los Angeles, CA 90012
213-974-1611

# EXHIBIT 2

ORIGINAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JUAN E. RODRIGUEZ,                    )
                                      )
                PLAINTIFF,            )
                                      )
        VS.                           )  CASE NO. 2:19-CV-03985
                                      )       FLA (Skx)
CITY OF LOS ANGELES, A PUBLIC         )
ENTITY, ROBERT LUGO, NIALL BRYNE,     )
ROBERT PEREZ, ROSALIE GARCIA AND      )
DOES 1-9,                             )
                                      )
                DEFENDANTS.           )
_____)

VIDEO CONFERENCE DEPOSITION OF JUAN E. RODRIGUEZ

TAKEN ON

WEDNESDAY, MAY 26, 2021

MELINDA S. WOMELSDORF, C.S.R. NO. 13124

10:31:49:09  1   called Detective Lugo to find out what was happening

 2   based upon your conversation with your father; is that

 3   correct?

 4       A     That's correct.

10:31:59:15  5       Q     Did you call Detective Lugo on the same day

 6   that you heard from your father?

 7       A     No. I remember it was around the end of

 8   summer, the Labor Day holiday. So I think I called soon

 9   after Labor Day.

10:32:28:13 10       Q     How long was your conversation with Detective

11   Lugo that time you called him in September 2007? Do you

12   recall?

13       A     If I had to estimate, it was somewhere between

14   five and ten minutes.

10:32:42:27 15       Q     Okay. Now, please tell me what -- everything

16   you can recall about that conversation.

17       A     Lugo had asked me for my social security

18   number, which I gave to him. He asked me for my

19   driver's license number, which I gave to him. Um, he

10:33:01:21 20   had asked me what I was doing in the summer of 2000, and

21   that's around the time I was graduating law school. He

22   indicated to me that I wasn't the guy he was looking

23   for.

24       Um, what else did he say? He -- um, he had

10:33:26:26 25   mentioned that there was a warrant out for my arrest,

                                                         26

| | | |
|---|---|---|
| 10:33:29:29 | 1 | but there was also a warrant out for the arrest of some |
| | 2 | other guy who had my first name and my last name and my |
| | 3 | birthdate. Not, like, just my birthdate like month and |
| | 4 | day, but like my actual birthdate. Like, month, day, |
| 10:33:51:13 | 5 | year. Um, and that Lugo would -- he indicated that I |
| | 6 | was on some national database for arrest. And so he |
| | 7 | said he would remove me from the warrant or get rid of |
| | 8 | the warrant that was for me, and that he would remove me |
| | 9 | from this national database or databases for my arrest. |
| 10:34:29:21 | 10 | Q    What else did you discuss with Sergeant Lugo |
| | 11 | or then Detective Lugo? |
| | 12 | A    That's all I can recall for now from that |
| | 13 | conversation. And that was back in 2007. Around the |
| | 14 | Labor Day of 2007, around that time. It was a long time |
| 10:34:50:19 | 15 | ago. |
| | 16 | Q    Yes. So I appreciate that you can recall a |
| | 17 | lot of it. |
| | 18 | What was the demeanor of -- |
| | 19 | A    I should say that -- |
| 10:35:00:12 | 20 | Q    -- Detective Lugo towards you? |
| | 21 | A    I'm sorry. I just -- I think he mentioned |
| | 22 | something to the effect that the person he was looking |
| | 23 | for was shorter than me as well. I think that's another |
| | 24 | fact that I think he mentioned. |
| 10:35:18:28 | 25 | Q    Did he tell you the crime for which this |

27

10:46:56:25  1   about other people, then you can answer.

         2      THE WITNESS: Yeah.  I -- I did try to communicate

         3   with attorneys before I hired this -- the attorneys that

         4   I have now.

10:47:06:28  5   BY MR. RAMIREZ:

         6      Q   And excluding any attorneys.  You said your

         7   sister, and I thought you said a friend of your sister,

         8   but I was unsure.

         9      A   I don't know how to describe it.  It's -- her

10:47:19:14 10   friend was one of the attorneys I was talking to so --

        11      Q   Okay.

        12      A   So that -- that was all around that -- the day

        13   of the -- around that time of the -- the raid on my

        14   home.

10:47:44:00 15      Q   Other than talking to your father back in

        16   September of 2007 about Detective Lugo trying to contact

        17   you, have you had any other subsequent conversations

        18   with your father regarding this incident?

        19      A   He's checked in with me on -- to see how

10:48:04:15 20   things were going with me, um, and how the case was

        21   going.  And I told him this -- this stuff takes years so

        22   I -- you know.  So --

        23      Q   And are your parents still living in Virginia?

        24      A   Yes, they live in Virginia.

10:48:22:01 25      Q   What city?

                                       37

10:48:22:17  1        A    Mechanicsville, Virginia.

            2        Q    What is that near?

            3        A    I -- it's not far away from Richmond,

            4   Virginia.

10:48:35:05  5        Q    Okay.  Thank you.

            6             And you said you live with your wife and two

            7   dogs?

            8        A    Yes.

            9        Q    Okay.  Any children?

10:48:45:12 10        A    No children.

           11        Q    All right.  What's the highest level of

           12   schooling that you have completed?

           13        A    Law school.

           14        Q    Which law school?

10:48:57:18 15        A    Loyola Law School, Los Angeles.

           16        Q    When did you graduate from Loyola?

           17        A    2000.

           18        Q    Have you taken the bar exam?

           19        A    I have taken it.  I did not pass.

10:49:14:26 20        Q    When was the last time you took the bar?

           21        A    Years ago.  I gave up.  I gave up.

           22        Q    Don't give up.  You know, they've lowered the

           23   passing score so you may want to keep that in

           24   consideration.

10:49:30:14 25        A    I think I just changed my career.

                                                                38

10:49:33:24  1          Q    Where did you complete your undergraduate

           2   degree?

           3          A    University of California Berkeley.

           4          Q    And you had a degree in what area?

10:49:55:17  5          A    It's an interesting question.  Um, I don't

           6   mean to -- to over share, but I designed my own major in

           7   Berkeley because the major I wanted did not exist.  So,

           8   um, it was, um, through the independent studies field.

           9   And my major was titled -- titled business and industry

10:50:18:25 10   organizational studies.  And I completed a minor in

          11   business administration.

          12          Q    Other than the incident April of 2018, have

          13   you ever been arrested by law enforcement for any other

          14   reason?

10:50:51:08 15          A    No.

          16              (ZOOM disruption.)

          17          THE WITNESS:  I'm not sure if my answer came

          18   through, no.

          19   BY MR. RAMIREZ:

10:51:01:16 20          Q    Again, sorry.  It froze there.

          21          A    I -- I didn't know if you froze or I froze.

          22   But the answer is no.  The answer is no.

          23          Q    Probably me.  All right.  Thank you.

          24              Did you ever serve in the United States

10:51:19:00 25   military?

                                                                    39

| | | |
|---|---|---|
| 10:51:19:23 1 | A | No. |
| 2 | Q | You said you have a new boss.  Where are you |
| 3 | currently employed? | |
| 4 | A | At the Walt Disney company. |
| 10:51:34:22 5 | Q | In Burbank? |
| 6 | A | Yes. |
| 7 | Q | And what is your position there, sir? |
| 8 | A | A director of content management. |
| 9 | Q | And what does that mean in layman's terms? |
| 10:51:49:10 10 | A | I work with our producer groups that make |
| 11 | content and our sales teams around the world to make | |
| 12 | sure our -- our content is sold, licensed, programmed, | |
| 13 | et cetera. | |
| 14 | Q | So movies -- |
| 10:52:07:07 15 | A | Movies -- |
| 16 | Q | -- screening content, things of that nature? |
| 17 | A | Yes. |
| 18 | Q | And how long have you been at Walt Disney |
| 19 | company? | |
| 10:52:18:22 20 | A | Since August of 2010. |
| 21 | Q | So in April of 2018, I believe, when LAPD came |
| 22 | to your house, were you employed with Walt Disney | |
| 23 | company at that time? | |
| 24 | A | Yes. |
| 10:52:42:26 25 | Q | All right.  And what division were you |

40

```
10:52:45:03  1   employed at during that time?

             2        A    That's a great question.  The division names

             3   have changed quite a bit at Disney.  But at that time,

             4   it was called Disney Media Distribution.  But I think I

10:53:00:12  5   get paid through some Disney shell company.  I forget

             6   the name of it, but it's on my tax documents.

             7        Q    So as long as you get paid on time, you're not

             8   too concerned about where it comes from; right?

             9        A    As long as it comes from Disney, that's right.

10:53:16:28 10        Q    Okay.  How long have you been with the Walt

            11   Disney company?

            12        A    Since August of 2010.

            13        Q    2005?

            14        A    No.  No. August of 2010.

10:53:31:18 15        Q    Oh, 2010.  All right.

            16        A    Sorry if my audio is low.

            17        Q    It may be me as well so please don't

            18   apologize.  We're all learning these new tools.

            19        MR. RAMIREZ:  Mr. Washington, is there a loss of

10:53:56:10 20   earnings claim?

            21        MR. WASHINGTON:  One moment.  This might take a

            22   second.  Do you -- if you want to -- do you want to go

            23   off the record while I --

            24        MR. RAMIREZ:  Let's take a break.

10:54:11:15 25        MR. WASHINGTON:  Okay.

                                                                      41
```

11:25:55:27  1      Q    And what was that second conversation

         2  concerning?

         3      A    That was him -- the follow up. Um, he said he

         4  was looking into the matter. So what Perez had told me

11:26:10:03  5  was similar to what Lugo said, but some additional

         6  information.

         7           So Perez told me that the bad guy that they

         8  were after had my first name and my last name. But

         9  Perez said that he used -- the bad guy used a different

11:26:29:18 10  middle name and that the bad guy uses a second last

        11  name. Um, and I remember -- you know, referring back

        12  to -- um, Bryne had -- had said something to the effect

        13  of I needed to go through some judicial clearance

        14  process. I asked Perez about it and he said that he

11:26:55:07 15  would get back to me on that.

        16      Q    Anything else you recall during that second

        17  conversation?

        18      A    Um, as far as -- no, I don't -- I don't recall

        19  anything right now. But I remember getting those extra

11:27:16:08 20  bits of data about who this bad guy was. And I think

        21  I -- I think I asked him again, concerned about the

        22  identity issue, if this bad guy was committing crimes

        23  with my identity or using my name. And I think Perez

        24  confirmed again that he wasn't.

11:27:35:08 25      Q    Okay. Was there any other communication

                                                              55

11:27:37:26  1  between you and Detective Perez after that second

2  telephone call?

3      A   No.

4      Q   Did you ever try to attempt to reach Detective

11:27:50:09  5  Perez after that second conversation?

6      MR. WASHINGTON:  Objection.  Vague and ambiguous.

7      THE WITNESS:  Um, generally speaking, we wrote a

8  letter to, um, the city about -- um, that initial

9  letter.  I don't think you -- I think that's the one

11:28:11:00 10  that you said you don't have a copy of but --

11  BY MR. RAMIREZ:

12      Q   Correct.

13      A   -- that was the next step that -- that -- that

14  was taken once I -- once we didn't hear back from Perez

11:28:22:18 15  any further.

16      Q   Had you attempted to reach Detective Perez but

17  to no avail, which is why you sent the letter?

18      A   No.

19      Q   Okay.  All right.  Now, if we can please go to

11:28:39:02 20  Exhibit Number 2.  If we could show that to everybody,

21  please.

22          (Exhibit 2 was marked for identification

23          by the Certified Shorthand Reporter and

24          a copy is attached hereto.)

25

56

```
11:28:49:14  1   BY MR. RAMIREZ:

             2        Q    Mr. Rodriguez, I'm showing you Exhibit 2,

             3   which has at the very top, California Department of

             4   Motor Vehicles, image record for Rodriguez, Juan

11:28:58:17  5   Esteban.  And there's a photograph there.

             6             Do you recognize that photograph?

             7        A    That's me.

             8        Q    All right.  And looking at the information up

             9   on the top, it has a B3410194.

11:29:14:15 10             Is that your driver's license number?

            11        A    Yes.

            12        Q    And date of birth, it has 01/05/1975.

            13             Is that your actual date of birth?

            14        A    Yes, that is my actual date of birth, January

11:29:28:02 15   5, 1975.

            16        Q    And the address listed at the time of this DMV

            17   record is 14008 Roseton Avenue, R-O-S-E-T-O-N, Avenue,

            18   Norwalk, California 90650.

            19             At the time this document was prepared, was

11:29:47:00 20   that your address at the time -- at some -- at some

            21   point in time?

            22        A    I don't know when this document was prepared,

            23   but that's the address I lived in immediately before the

            24   Lakewood address.

11:29:58:00 25        Q    The date of photo, right below that, says
```

                                                                    57

```
11:34:34:12  1        A    That's right.

             2        Q    All right.  Do you recall approximately what

             3   time it was in the morning that this was taking place?

             4        A    I can approximate or estimate somewhere around

11:34:48:20  5   6:30-ish, 6:00-ish.  Somewhere around that time, I

             6   think.

             7        Q    All right.  Early in the morning?

             8        A    Early in the morning.

             9        Q    Gesundheit.

11:35:00:23 10        A    Gesundheit.

            11        Q    What's the next thing you recall happening

            12   after your wife says, "Juan, the police are here."  What

            13   happened next?

            14        A    I get up from the bed.  Um, I'm in my pajama

11:35:15:04 15   pants and T-shirt.  And I walk to the front living room

            16   of the house where the front door is.  And I see my wife

            17   opening the door.  And there's an officer already at the

            18   door.

            19        Q    Can you describe what that officer was

11:35:34:13 20   wearing?

            21        A    I think he had a T-shirt and, I think,

            22   jeans --

            23        Q    What --

            24        A    -- and some form of vest.  Like, I don't know

11:35:51:23 25   what you call it.  Some form of vest.

                                                                        61
```

11:35:56:15  1        Q    And did the vest have markings on it

          2   identifying -- identifying that person as a police

          3   officer?

          4        A    That I don't remember.

11:36:05:05  5        Q    All right.  What's the next thing you recall

          6   doing or seeing after you saw that officer wearing some

          7   kind of a T-shirt and a vest at the front door?

          8        A    So he was asking my wife -- he had -- she

          9   was -- he had his gun out, pointed downwards, looking at

11:36:26:23 10   my wife and asking her, "Is Juan Rodriguez here?"  And

         11   that's when I was entering the room.  And without

         12   skipping a beat, he turned his head, looked right at me,

         13   and he motioned --

         14        Q    What --

11:36:44:12 15        A    -- he motions for me to approach towards him.

         16   Again, I would -- I had just woken up.  Now that I look

         17   back, I think maybe I should have raised my hands in the

         18   air, but I was just walking towards him asking him, you

         19   know, "What's going on?"

11:37:01:08 20            And, you know, he asked me to step outside.

         21   And as he -- um, as I was, like, just a couple feet away

         22   from the door, I remember -- um, I remember like a hand

         23   on me like -- like guiding me out the door.  And I was

         24   on the front stoop, I felt a hand go down my left arm

11:37:30:29 25   and slightly pull it back, and a hand go down my right

                                                                    62

11:54:16:22  1   I remember saying, "Good.  I'll give you my blood."

2   Anything -- at this point in my head I'm, like, thinking

3   anything I can do to eliminate myself, again, as a

4   suspect I'm -- yeah, like, I'll give you my blood.

11:54:28:00  5   Like, whatever you need.

6          I remember Bryne saying to me that I might

7   have to go to the police station to get fingerprinted,

8   um, and to -- you know, to resolve the matter or workout

9   what was going on.  I said, "Okay.  Sure.  Whatever --

11:54:43:02 10   whatever you need.  You know, whatever you need to

11   eliminate me again."  Like, um, I remember that

12   conversation.

13          Um, I remember, um, the -- the officer who had

14   handcuffed me, was standing with me kind of in the

11:55:04:07 15   kitchen area and that taller, white officer, not Bryne

16   but the taller, white officer at some point was on the

17   phone with somebody.  I just assumed it was with the

18   LAPD headquarters or someone.  They were talking to

19   somebody.  And I remember I overheard that white officer

11:55:20:02 20   say that the person -- something like the person had

21   been living in Mexico that they are looking for, um, and

22   that they had scars.  And I remember exclaiming "Scars,"

23   like -- like, you know, the DMV photo doesn't have scars

24   -- my DMV photos doesn't have scars in it.  I clearly

11:55:46:14 25   don't have scars.  I was thinking, like, but you have --

76

11:55:47:26  1  you have this exculpatory -- in my mind I was thinking,

  2  "What's going on here?"

  3         And I remember the officer who had handcuffed

  4  me immediately started saying, "I see scars on his face.

11:55:58:09  5  I see scars on his face." And I remember the female

  6  officer was kind of to the right of me, and I remember

  7  turning to her so she could see my face, and she said,

  8  "No, I don't see any scars on his face."

  9         And then that same officer who had handcuffed

11:56:14:18 10  me was proclaiming I had scars on my face, "Oh, but they

 11  can fade. Scars can fade. I see them. I see them."

 12  So that -- that was concerning to me. I was -- at that

 13  point I was getting afraid. Like, really afraid that

 14  they wanted really to take me to jail even though I

11:56:29:24 15  wasn't the guy they are looking for. Like, they were

 16  trying to invent evidence or something. I didn't -- I

 17  didn't understand what was going on, but that was scary

 18  to me.

 19         Um, but, um, those are -- those are some of

11:56:44:11 20  the conversations I remember taking place in the house.

 21     Q   While the officers were in your house, did

 22  they ever allow you to get dressed and out of your

 23  pajamas and into regular clothes?

 24     A   No.

11:57:02:24 25     Q   Okay. You stayed in pajamas the entire time?

                                             77

11:57:05:25 1      A   Pajamas and a T-shirt. Pajama pants and a

2  T-shirt.

3        Oh, I do recall the officer -- I'm sorry. I

4  do recall the officer who had handcuffed me asking for

11:57:19:10 5  where I had worked. I told him I worked at Disney. Um,

6  and he was given business cards of mine from Disney, and

7  he was writing stuff -- a lot of stuff down.

8        Um, that same officer was asking me where I

9  had previously lived. Like, he had a sheet of paper

11:57:36:24 10  with him, and he had -- he asked me like the previous --

11  my previous addresses and I started rattling some of

12  them off. I remember him nodding his head, almost like

13  he's checking off a list.

14        Um, later on, um, I remember one of the

11:57:55:09 15  officers giving me a sheet of paper, um, and it had my

16  picture on it, it had a lot of my DMV record stuff on

17  there. But the social security number was not mine. It

18  was someone else's. Which I think what Lugo was digging

19  into years earlier is like -- you know, but the social

11:58:14:12 20  security number on that sheet of paper was not mine.

21  And I remember exclaiming at that point, "Oh, no, you've

22  transposed all of my DMV records onto someone else's

23  warrant. This is what my thinking was at the time.

24  Like, I really thought this was someone else's warrant.

11:58:34:07 25  They just put all my data on that person's warrant.

                                                      78

1  State of California      )
                            )  SS.
2  County of San Bernardino)

3

4          I, MELINDA WOMELSDORF, Certified Shorthand

5  Reporter, License No. 13124, for the State of

6  California, do hereby certify:

7          That, prior to being examined, the witness

8  named in the foregoing video conference deposition, to

9  wit, Juan E. Rodriguez, was by me duly sworn to testify

10  the truth, the whole truth and nothing but the truth;

11          That said video conference deposition was

12  taken down by me in shorthand at the time and place

13  therein named and thereafter reduced to computer-aided

14  transcription under my direction;

15          That the foregoing transcript, as typed, is

16  a true record of the said proceedings.

17          I further certify that I am not interested

18  in the event of the action.

19          Witness my hand this 10th day of June,

20  2021.

21

22

23          MELINDA WOMELSDORF, CSR. NO. 13124

24

25

                                                      124

# EXHIBIT 3

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   JUAN RODRIGUEZ,                    )
                                       )
5              Plaintiff,        ) Case No.
                                       ) 2:19-CV-03985-DMG-PJW
6         vs.                          )
                                       )
7   CITY OF LOS ANGELES, et al.,  )
                                       )
8              Defendants.        )
                                       )
9   _____)

10

11

12

13      ZOOM DEPOSITION OF DETECTIVE NIALL BYRNE,

14         INDIVIDUALLY AND AS RULE 30(b)(6)

15       WITNESS FOR THE CITY OF LOS ANGELES

16          WEDNESDAY, FEBRUARY 10, 2021

17

18

19

20

21   REPORTED BY:
     JARDENE L. PLATT,
22   RPR, CSR No. 3724
     Job No. 4451546-1
23   Pages 1 - 261

24

25

                                        Page 1

```
1   BY MR. WASHINGTON:
2       Q.   So I guess more concretely what I'm saying
3   is, when an officer files for an arrest warrant or
4   investigating officer files for an arrest warrant and
5   they have some information prepared by whoever else
6   was previously the investigating officer, there's no
7   particular LAPD training on how to deal with the
8   information in the file prepared by the prior
9   investigating officer.  Is that correct?
10      A.   I would say that's correct, yes.
11      Q.   Okay.  Thanks.
12           When an officer is putting in information
13  for a warrant, what information is required for that
14  process?
15      A.   As much information as you can obtain on
16  the person that you are looking to obtain the warrant
17  on.  Obviously name, date of birth, address.  Any
18  kind of vehicle information at the time.  Any kind of
19  criminal -- criminal identifying numbers.  Social
20  Security number or a driver's license number or an
21  alien registration card.
22           Any kind of information -- the more
23  information you can attain on an individual, it's --
24  it's imperative and helps the field officers and
25  people in my current position make an arrest because
```

Page 28

1    you have got the most detailed information on the

2    warrant information sheet.

3        Q.    Okay.   Is there training concerning this

4    for LAPD officers?

5        A.    It's -- it's -- you go over it in detective

6    school and then it's more a hands-on training where

7    you are assigned to a table at a division as a new

8    detective you are usually partnered up with a

9    supervising detective or a tenured department --

10   detective from that table.   And they will go over the

11   procedure on how to fully file a case and file a case

12   for a warrant.

13       Q.    Is there -- is there any kind of written

14   or -- sorry.   Let me step back.

15            Is there any kind of standardized

16   documentation on how to go -- on how to fully file

17   the case or is that more something that the

18   individual officer explains from their own

19   experience?

20            MR. RAMIREZ:   Objection.   Compound.

21            But you may respond if you understand,

22   Detective.

23            THE WITNESS:   When we file cases, we are

24   filing cases with the Los Angeles district attorney's

25   office.   So we are using their paperwork.   So in

                                           Page 29

1    responsible for input -- for officers who are

2    responsible for putting information into a warrant,

3    do they have any specific training on how to ensure

4    the warrant doesn't target the wrong person?

5         A.   Well -- well, we obtain a warrant, we are

6    not targeting the wrong person.  We are targeting the

7    person that we have identified through our

8    investigation.  So you are putting information on the

9    warrant information sheet that you believe is true,

10   correct and accurate for the person you believe

11   committed the offense.

12        Q.   Is there any -- is there any training on

13   how to ensure that the information -- any specific

14   training on how to -- let me -- sorry.  I will

15   rephrase that.

16             Is there any specific training in the LAPD

17   on how to ensure that the information on a warrant is

18   accurate and accurately reflects the target?

19             MR. RAMIREZ:  Vague and ambiguous.

20             You may respond if you understand.

21             THE WITNESS:  It would be the -- it would

22   be what we have discussed prior.  It could be knowing

23   how to conduct an investigation.  Knowing when you

24   have a positive identification on the suspect.

25   Obtaining all the criminal history and identifiers

Page 43

1    you can for that person that you have identified and

2    then transposing it from a hard copy or computer

3    screen onto the warrant information sheet.

4    BY MR. WASHINGTON:

5        Q.    Okay.  So as far as amending a warrant, is

6    there any specific guidelines or training by the LAPD

7    as to how this should be done?

8        A.    Again, I think there's documentation in the

9    detective operation manual, but it happens so rarely

10   that it be on a case-by-case and able to --

11   case-by-case basis and the detective involved in the

12   case would have to get guidance from somebody at the

13   division level that has possibly done it before in

14   the past or at the district attorney's office and

15   more commonly and more often would be the district

16   attorney's office.

17       Q.    Okay.  How about training on when to amend

18   a warrant?  So like -- in other words, if -- if an

19   officer discovers information that indicates the

20   warrant includes the wrong information, is there any

21   particular training by the LAPD as to what to do in

22   that situation?

23       A.    Well, the only training that you receive is

24   to correct it immediately and then you would have to

25   go by what we just discussed.  Find somebody that has

                                              Page 44

```
 1   amended a warrant at the division level or reach out
 2   to someone at the district attorney's office for
 3   guidance on how to have the warrant amended.
 4       Q.    Okay.  But there's no specific protocol for
 5   the situation as far as you should notify person X.
 6   Is that right?
 7       A.    I don't know who person X is.
 8       Q.    A hypothetical -- let me rephrase then.
 9   There's no particular training on -- on any -- who
10   you should bring this to -- sorry.  Let me rephrase
11   that actually.
12            There's no particular training as far as
13   who you should bring relevant information about
14   amending a warrant to within the LAPD.  Is that
15   correct?
16            MR. RAMIREZ:  Misstates his testimony.
17   Vague and ambiguous.
18            But you may respond, Detective.
19            THE WITNESS:  I'm going to answer this the
20   best I can and I think I understand what you are
21   asking.  So if a -- let's say detective I who is not
22   a supervisor finds out that some sort of mistake was
23   made on a warrant and it needed to be amended, he or
24   she should immediately notify -- get his or her
25   supervisors involved in the process and get some
```

Page 45

1    guidance from them as to what needs to happen next.

2    BY MR. WASHINGTON:

3        Q.    Okay.  Is there any -- does the LAPD have

4    any sort of formal policy that this should occur?

5        A.    Not that I'm aware of.  I think they are

6    more concerned about having it corrected immediately

7    or amended immediately.

8        Q.    So in other words, the training is if you

9    find that there's information that would warrant an

10   amendment, it should be -- you should take care of it

11   immediately but there's no specifics as to what that

12   should look like.  Is that right?

13       A.    What do you mean by "specifics"?  You are

14   going to fix the warrant so you are amending the

15   warrant and that's -- would be the specifics.

16       Q.    So there's no particular person who would

17   be in charge of ensuring the amendment occurred.  Is

18   that right?

19       A.    It would be on a case-by-case basis but

20   again, ultimately it would be the detective III of

21   the table.  They are responsible for everything that

22   occurs on the table.

23       Q.    So -- okay.  If I understand it correctly,

24   so the detective III is generally responsible for

25   whatever happens in the table.  Is that accurate?

Page 46

1      A.    That is accurate.

2      Q.    Okay.  So their role -- so in that sense

3  they would ultimately be responsible for amending a

4  warrant in the same way that they would be ultimately

5  responsible for anything that happens at the table.

6  Is that accurate?

7      A.    They would be ultimately responsible for

8  ensuring that the warrant is amended.  They may not

9  do it themselves, but they need to ensure that they

10  assign it to somebody who can have the amendment made

11  in a timely fashion, and it may fall upon themselves

12  to get that done.

13     Q.    Is there any kind of training for detective

14  III on how this is -- how this is to occur?

15  Logistically what they do if someone comes to them

16  and says, "We need a warrant amended"?

17     A.    Again, it happens so infrequently that

18  unless the detective III had -- had that happen in

19  their cases, they would probably have to do the same

20  thing the detective bringing the information to them

21  would have to do.  Either find somebody at the

22  divisional level that actually knows how to do it or

23  reach out to the detective -- district attorney's

24  office for guidance.

25     Q.    Okay.  All right.  So I -- just give me one

Page 47

1           MR. WASHINGTON:  Ms. Platt, what exhibit
2    are we on?  Is this 3 or 2?
3           THE REPORTER:  I believe 3.
4           MR. WASHINGTON:  Okay.
5       Q.   So, Detective Byrne, are you familiar with
6    this document?
7       A.   The document itself, yes.  Not the
8    specifics contained within.
9       Q.   I'm sorry, you cut out a bit.  I think you
10   said itself but not the specifics.  It --
11      A.   I recognize that as a request for
12   confidentiality for a -- a crime report.
13      Q.   Okay.  So that would be JER-COLA 6.
14           So the next document, JER -- begins
15   JER-COLA 7 and goes to JER-COLA 11.  Do you recognize
16   this document?
17      A.   I recognize it as a preliminary
18   investigation report, yes.
19      Q.   Okay.  What is -- what is the purpose of a
20   preliminary investigation report?
21      A.   It documents that a crime occurred.
22      Q.   Is this part of the warrant package?
23      A.   It would -- yes.  It should be.
24      Q.   Okay.  Do you know if it was part of the
25   warrant package here?

                                        Page 63

1        A.    I do not know.

2        Q.    So on this document it lists some

3    descriptions for Juan Rodriguez which is sex,

4    description, hair, eyes, height, weight and age.  Can

5    you tell how this information was -- let me rephrase.

6            Do you know how this information was

7    obtained?

8        A.    Not with certainty, but based on prior

9    experience on taking a report, I could give my

10   opinion.

11       Q.    What would that be?

12       A.    The responding patrol officers got it

13   through the course of their on-scene investigation

14   with either the victim or victim's mother or

15   witnesses on scene.

16       Q.    So there -- so I think my understanding is

17   there's no particular training as to how to treat

18   this information as opposed to information from

19   another source such as the DMV.  Is that correct?

20       A.    Treat it?

21       Q.    Yeah.  For -- for the purpose of applying

22   for a warrant, basically to rely on statements from

23   victim or statements from the DMV or information from

24   the --

25       A.    I don't understand your question.

Page 64

```
 1          A.    Not to my knowledge.

 2          Q.    Okay.  So if someone is a resident alien,

 3    then you would expect -- would you expect a DMV pull

 4    such as this one?

 5                MR. RAMIREZ:  Vague and ambiguous.  Lacks

 6    foundation.

 7                You may respond if you can, Detective.

 8                THE WITNESS:  Maybe now but not back in

 9    2000.

10    BY MR. WASHINGTON:

11          Q.    Why is that?

12          A.    I don't believe in 2000 resident aliens or

13    people here illegally were able to obtain California

14    identification.

15          Q.    By that you mean the California driver's

16    license.

17          A.    California driver's license or California

18    ID card, yes.

19          Q.    Okay.  All right.

20                So I'm going to share another document with

21    you right now as Exhibit 4.  That's JER-COLA 16.

22                    (Exhibit 4 was marked for

23                    identification and is attached

24                    hereto.)

25    ///
```

Page 75

1    one we looked at, but --

2        Q.    Sure.  I can show you -- if we go back to

3    Exhibit 6, there's a -- there's what appears to be

4    kind of a supplementary page here, which says

5    investigation continued.

6        A.    Yeah.  It was on -- on 2-26-01 the case was

7    reassigned to Detective Garcia.

8        Q.    Okay.  Is there any way to -- now looking

9    at Exhibit 27, which is JER-COLA 14 to 15, do you

10    have a sense of whether this was -- would have been

11    done -- the follow-up investigation before the

12    warrant was issued?

13        MR. RAMIREZ:  Calls for speculation.  Lacks

14    foundation.

15        But you can answer if you understand,

16    Detective.

17        THE WITNESS:  Again, I don't believe this

18    is the official follow-up, but the follow-up would

19    have to be completed before you make the presentation

20    to the district attorney's office to get the case

21    filed and also obtain a warrant in this case.

22    BY MR. WASHINGTON:

23        Q.    Okay.  All right.

24        MR. RAMIREZ:  John, if you go to the top

25    right of that document looks like some handwriting.

Page 90

```
 1                (Exhibit 9 was marked for

 2             identification and is attached

 3             hereto.)

 4   BY MR. WASHINGTON:

 5        Q.   All right.  So back to the arrest warrant.

 6        A.   That's -- that's -- that's the statement of

 7   facts.  That's not an arrest warrant.

 8        Q.   Okay.  So yeah.  If we could break down the

 9   statement of the facts versus the warrant itself.

10             What does the warrant itself look like?

11        A.   It's a computer printout.  It -- the

12   warrant is all based off of the DA's statement of

13   facts.  After the -- after the case is reviewed by

14   the DA, the DA writes a summary of what occurred and

15   in that summary they -- they add a count of what the

16   individual is being charged with.

17        Q.   Okay.  So the printout you are referring

18   to, is that -- that's information in the county

19   warrant system or is this different --

20        A.   It would be information in the county

21   warrant system.

22        Q.   Okay.  Does any information other than what

23   the DA prepares go into the county warrant system?

24   So in other words, can --

25        A.   I don't think you fully understand how a
```

Page 102

1    case gets filed.  This is a statement of facts, which

2    means the case -- the DA has filed.  Is there another

3    page to this document where two counts of -- two

4    counts were filed?  Three counts.  So three counts

5    were filed by the DA.  The information that goes into

6    the California -- the California warrant system is

7    information off of the warrant information sheets

8    that is inputed into the database by the typing pool

9    at the DA's office after the case has been filed.

10        Q.    So -- that's based off of the -- off of

11   this document here then.  The --

12        A.    No.  The next exhibit.  The one that you

13   put up for a minute --

14        Q.    This is the warrant information signed --

15        A.    That's -- that's where all the information

16   is obtained for the warrant, which is inputed into

17   the California warrant system by the typing pool at

18   the district attorney's office after the case is

19   filed.

20        Q.    Okay.  Can you tell who filled out this

21   document?

22        A.    Down in the bottom left corner it appears

23   it was completed by detective or R. Garcia, serial

24   number 27448.

25        Q.    Okay.

Page 103

1    suspect.

2        Q.    Okay.  And what would dictate whether an

3    officer is running it through CWS or through the FWS

4    system?

5        A.    Their level of experience.  If they had a

6    flyer.  If they had a warrant number.  If they

7    received information from juvenile division.  Some

8    officers used to like to go into our database and

9    kind of just randomly search it for suspects they may

10   or may not know or crimes they wanted to work.  It's

11   more restrictive to just LAPD and we have put a

12   limitation on just randomly being able to access it

13   at the police officer level.  It would more

14   appropriately go into the California warrant system

15   to do it.

16       Q.    Okay.  All right.  So to your knowledge,

17   when was the first time after the detention or arrest

18   of Juan Esteban Rodriguez that the warrant was

19   amended?

20       A.    On April 11, I believe it was, a couple

21   days after this, I talked to Hidalgo and I asked him,

22   "Did you go into this and take care of the warrant?"

23   He told me yes.  So I believed that the warrant was

24   corrected on April 11 of 2018.

25       Q.    What do you mean, "corrected"?  What steps

Page 169

1    specifically?

2         A.    That we have contacted juvenile division on

3    9th, informed them that Juan Esteban Rodriguez was

4    not the correct suspect.  I made the decision not to

5    arrest him.  And we told them that they needed to

6    amend their warrant to take off Esteban, to take off

7    the CDL number.

8         Q.    Okay.  To do -- take any other steps?  I'm

9    sorry -- let me rephrase that.

10         Did you inform juvenile division that they

11    should take any other steps?  So far you mentioned to

12    remove his CDL number and take off the name Esteban.

13         A.    And then to review it for accuracy.  I

14    remember some sort of discrepancy with dates of

15    birth.  I don't remember if Juan Esteban Rodriguez's

16    correct date of birth was on the flyer or the date of

17    birth for Juan Rodriguez.  I would have to review the

18    flyer or -- I want to -- CDL for Juan Esteban

19    Rodriguez and then the flyer for Juan Rodriguez.

20         Q.    Okay.  All right.  Do you know if juvenile

21    division did these things?

22         A.    Based on my conversation with Hidalgo on

23    the 11th, he told me that juvenile division was

24    taking care of it.

25         Q.    Who was it that contacted -- so was it

Page 170

1    don't remember if it was 2007 specifically, but --

2    the conversation was based on him not being the

3    correct suspect on this warrant.

4         Q.    Okay.  Do you think it would be important

5    to follow up in juvenile division, given they appear

6    to have not corrected the warrant before?

7              MR. RAMIREZ:  Objection.  Argumentative.

8    Lacks foundation.

9              But you may answer if you can.

10             THE WITNESS:  I think we followed up on

11   April the 9th with him as soon as we found out that

12   the ball was dropped from 2007.  Then Hildago

13   followed up with him on April the 11th.  And I have

14   an expectation when I ask my guys to do something or

15   correct something, it gets done and I had that same

16   expectation with juvenile.

17             I contacted Detective Perez as a DII, who

18   is a supervisor.  I contacted him on the 9th.

19   Explained to him that there was misinformation on it.

20   We shouldn't have even -- it should have been -- it

21   should have been immediately handled.  And then I

22   think on the 11th reaching out and -- by Hildago to

23   the juvenile division and being told that it's being

24   taken care of, I feel very comfortable that the

25   warrant would be amended.

Page 176

```
 1   work should have been done to amend the warrant then
 2   and there.
 3        Q.   Okay.  To take us a step -- well, do you
 4   have a sense of how the DMV information for Juan
 5   Esteban Rodriguez was entered into the warrant?
 6             MR. RAMIREZ:  Calls for speculation.  Lacks
 7   foundation.
 8             But you can answer if you understand.
 9             THE WITNESS:  I -- personally, I have got
10   an opinion but I can't say with any kind of
11   certainty.
12   BY MR. WASHINGTON:
13        Q.   Well, that's okay.  With that caveat, what
14   is your opinion?
15        A.   I think what happened was that a majority
16   of the investigation was done by Detective Beardsley
17   and then it was passed over to Detective Garcia.
18   Unfortunately with this case, it's a very, very
19   common name by all the warrants that are returned
20   when you run a Juan Rodriguez and at some point in
21   time, Juan Esteban Rodriguez's information was
22   erroneously entered into the warrant information
23   sheet.
24        Q.   Okay.  So first question, does -- is an
25   investigative officer allowed to delegate the fact
```

Page 199

```
 1    finding for the information that goes into a warrant
 2    or is that their responsibility to obtain correct
 3    information?
 4            MR. RAMIREZ:  Compound.  Vague and
 5    ambiguous.
 6            But you can respond if you understand.
 7            THE WITNESS:  It's the IO -- it's the IO's
 8    responsibility to ensure that the correct information
 9    is put on the warrant information sheet.  There may
10    be a time when you have multiple cases and you are
11    trying to get to a filing deadline and you ask one of
12    your partners to say, "Hey, can you -- can you fill
13    out this form for me?"  But if that was the case,
14    then that detective should put their name on the
15    warrant information sheet.
16    BY MR. WASHINGTON:
17        Q.   Okay.  So is your opinion based on the --
18    well, do you think that Detective Beardsley
19    communicated to Detective Garcia that -- that this
20    DMV record for Juan Esteban Rodriguez is -- is the
21    record for the true suspect?  Is that your
22    understanding?
23            MR. RAMIREZ:  Calls for speculation.  Lacks
24    foundation.
25            But you can respond if you can.
```

Page  200

```
 1          A.    I would have to refer to my log.

 2          Q.    Okay.  Were you present for the detention

 3     or arrest of Mr. Rodriguez?

 4          A.    Yes, I was.

 5          Q.    What was your role during that -- during

 6     that time period?

 7          A.    I'm the detective supervisor.  Ultimately

 8     in charge of the squad.  I'm the highest ranking

 9     supervisor in the squad.  I'm a DIII and I did have a

10     detective II working that day.

11          Q.    Okay.  And so can you describe for me

12     how -- how the officers entered the home of

13     Mr. Rodriguez.  So in other words, you arrive at the

14     scene and then what occurs?

15          A.    We walk up to the door.  Detective Hildago

16     knocked on the front door.  The door was answered by

17     a female Hispanic who I believe was Mr. Rodriguez's

18     wife.

19               We told her -- explained to her why we are

20     there.  She said Mr. Rodriguez was I believe in the

21     rear part of the house and provided us access to come

22     in.  And we end -- there was six of us working so

23     that day so three or four of us entered the house,

24     and as we entered the house, Mr. Rodriguez exited the

25     rear section of the house.  Kind of in the living
```

                                            Page  225

1    room/den area and he was taken into custody without

2    incident.

3        Q.   Okay.  When you say three or four of the

4    officers entered the house, what were the other

5    two -- what were the other two or three officers

6    doing?

7        A.   They would have remained outside, kind of

8    in containment perimeter looking down the side of the

9    house to see if he -- if a suspect jumps out the

10   back, we like to have some sort of containment so we

11   could set up a perimeter.

12       Q.   Did anyone go towards the side of the house

13   as part of this?

14       A.   Absolutely.

15       Q.   All right.  Could you see these officers --

16   the officers at the side of the house or otherwise

17   stationed around the house?

18            MR. RAMIREZ:  Vague and ambiguous.

19            You can answer if you can.

20            THE WITNESS:  I don't think so because I

21   was more -- I'm more focused on communicating to

22   those officers what occurs at the front door, when

23   the front door is opened.  If we have contact and

24   whom we have contact with.  We were -- we were light

25   that day with only six of us working so I was

Page 226

1    at any point during the arrest?

2         A.    Not to my knowledge, no.  I believe he

3    remained inside.

4         Q.    Okay.  Was Mr. Rodriguez handcuffed as part

5    of this process?

6         A.    Yes, he was.

7         Q.    How long was he handcuffed for?

8         A.    Anywhere from 10 to 20 minutes, until I was

9    able to determine that in fact he was not the correct

10   Juan Rodriguez.

11        Q.    Okay.  So I take it Mr. Rodriguez was not

12   free to leave at this time.

13        A.    No.

14        Q.    Okay.  Who was it that carried out the

15   handcuffing of Mr. Rodriguez?

16        A.    I can't say it with certainty but normally

17   if the -- if the IO or investigating officer doesn't

18   get held up at the door, they are normally the ones

19   that put the handcuffs on with the assistance of

20   their partner.

21        Q.    Okay.  Did you observe the handcuffing?

22        A.    I don't recall.  I can't -- I can't say

23   with certainty.  I know that I normally remain in the

24   front of the residence managing and talking to and

25   dealing with family members.  That's my main role and

Page 233

1          I, JARDENE L. PLATT, RPR, CSR No. 3724 in and

2     for the State of California, do hereby certify:

3          That prior to being examined, the witness named

4     in the foregoing deposition was by me duly sworn to

5     testify as to the truth, the whole truth, and nothing

6     but the truth.

7          That said deposition was taken before me at the

8     time and place therein set forth and was taken down by

9     me stenographically and thereafter transcribed via

10    computer-aided transcription under my direction and is

11    a true record of the testimony given, all done to the

12    best of my skill and ability.

13         Before completion of the deposition, review of

14    the transcript [XX] was [ ] was not requested.

15         I further certify that I am neither counsel for,

16    nor related to, any party to said action, nor

17    interested in the outcome thereof.

18         IN WITNESS WHEREOF, I have hereunto subscribed

19    my name.

20    Dated:  February 23, 2021

21

22

23

24         JARDENE L. PLATT, RPR, CSR No. 3724

25

                                        Page 261

# EXHIBIT 4 (FILED UNDER SEAL)

# EXHIBIT 5(FILED UNDER SEAL)

# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JUAN RODRIGUEZ,                )
                                    )
 5               Plaintiff,         ) Case No.
                                    ) 2:19-CV-03985-DMG-PJW
 6        vs.                       )
                                    )
 7   CITY OF LOS ANGELES, et al.,   )
                                    )
 8               Defendants.        )
                                    )
 9   _____)
10
11
12
13
14       ZOOM DEPOSITION OF SERGEANT ROBERTH LUGO
15            WEDNESDAY, FEBRUARY 10, 2021
16
17
18
19
20
21   REPORTED BY:
     JARDENE L. PLATT,
22   RPR, CSR No. 3724
     Job No. 4451546-2
23   Pages 1 - 67
24
25
```

                                              Page 1

1        Q.    Okay.  What did you discuss with

2   Mr. Rodriguez?

3        A.    I don't specifically recall the

4   conversation, but just common practice would ask him

5   any information regarding the crime and his personal

6   information to verify whatever information he was

7   trying to tell me, that he was not the suspect.

8        Q.    All right.  When -- would that have

9   included his Social Security number?

10        A.    I don't remember.  But probably.

11        Q.    Okay.  Okay.  So is it fair to say then

12   that once -- after conducting your due diligence, you

13   were confident that Juan Esteban Rodriguez, the

14   person you spoke to, was not the proper subject on

15   the warrant?

16        A.    There was a lot of work that I did before

17   that.  I had to -- suspects lie to us all the time.

18   So I did follow-ups to make sure that -- the story

19   that he was telling me was in fact true.  Meaning I

20   did more follow-ups with the new information that he

21   provided.

22             Follow-ups, I spoke with the victim to make

23   sure the photographs from DMV wasn't his.  The

24   information wasn't his.

25             I did -- I also contacted his -- the real

Page 25

1          A.    Not that I recall, sir.

2          Q.    Okay.  I take it that was not in the

3     warrant beforehand.

4          A.    Once again, it's 14 years later.  I do not

5     specifically recall.

6          Q.    All right.  Okay.  Let's see.

7               I will pull up those employment documents

8     now.  So this will be Exhibit 4.

9                    (Exhibit 4 was marked for

10                   identification and is attached

11                   hereto.)

12    BY MR. WASHINGTON:

13         Q.    JER-COLA 25 to 26.

14              Sergeant Lugo, are these the documents you

15    were referring to?

16         A.    They look familiar, yes, sir.

17         Q.    So in other words, are these the documents

18    that you found in 2007 as part of your due diligence?

19         A.    Yes, sir.

20         Q.    All right.  Did you make a clearer copy of

21    this when you made this -- when you included these

22    documents in the felony warrant package?

23         A.    As clear as I could, sir.  It was provided

24    by the employer.  The clear -- clearest copy that I

25    could make.

                                        Page  27

```
 1    been, once again, other detectives, fugitive warrant
 2    section and R and I were the ones that process these
 3    kinds of documents.
 4         Q.   Okay.
 5         A.   Remember, I was a brand-new detective at
 6    the time and this is 14 years later.
 7         Q.   Okay.  So during this process you are doing
 8    your due diligence investigation.  Who all did you
 9    talk to at -- at the LAPD about this issue that the
10    warrant needed to be amended?
11         A.   Well, immediately --
12              MR. RAMIREZ:  Objection.  Asked and
13    answered.  Document speaks for itself, but he may
14    respond.
15              THE WITNESS:  I notified the original IO,
16    the one that input the system, the warrant in the
17    system, Detective Garcia, and notified my DIII,
18    Detective Quijano, and the lieutenant.
19    BY MR. WASHINGTON:
20         Q.   What was the lieutenant's name?  Was it --
21    go ahead.
22         A.   Maybe Felicia Hall.  You have to check.
23    It's on the -- it's on the form.  I'm not sure.
24    Strike that.  I don't recall.
25         Q.   Okay.  So you submitted to a lieutenant.
```

1    name?

2        A.    The division that followed my name?  No.

3    Because the form that -- the one that we covered from

4    district attorney's office, that is regarding

5    extradition.  So now my name is attached to that

6    request.  So that's when my name is supposed to go

7    there.  One is following the directions from R and I

8    and the district attorney's office as far as filling

9    out forms.

10        Q.    So what this is saying is to contact

11    Detective Lugo regarding extradition.  Is that

12    accurate?

13        A.    Correct.

14        Q.    Okay.  All right.  Okay.  So what was your

15    understanding of what -- of what needed -- what, if

16    any, further steps were needed from LAPD to -- to

17    amend the warrant?

18        A.    After I submitted all the forms that were

19    necessary, the district attorney, the person I was

20    speaking with at the court, I don't remember their

21    specific conversation, they were -- they told me that

22    since the IO, Detective Garcia, the one that input

23    the warrant into the system, was still available,

24    that she had to come in and complete, provide a

25    statement to the judge so they can document the

Page 42

1    changes.

2          Q.    Okay.  All right.  All right.

3              I'm going to pull up another exhibit.  This

4    is going to be Exhibit 8, which is JER-COLA 135 to

5    137.

6                  (Exhibit 8 was marked for

7                  identification and is attached

8                  hereto.)

9    BY MR. WASHINGTON:

10          Q.    Do you recognize these?

11          A.    Yeah.  Those look like emails between

12    myself, the DIII and Detective Garcia.

13          Q.    Okay.  The DIII is Monica Quijano?

14          A.    Monica Quijano.

15          Q.    So starting down here, what is the -- what

16    is this document on JER-COLA 137?

17          A.    That looks like --

18              MR. RAMIREZ:  I object.  There are like two

19    documents there.  It appears to be some kind of a

20    note attached and then there's some warrant

21    information or identification on top.  So are you

22    talking about one in particular?

23              MR. WASHINGTON:  I'm just -- this page.

24          Q.    Do you recall what this page was?  It looks

25    like there's some document -- it's a printout with

1        Q.    Okay.  Was the fax request part of the
2   fugitive warrant -- I'm sorry, the felony warrant
3   package?
4        A.    The information that I received?
5        Q.    Yeah.  In your request.
6        A.    Yes.  It should be part of the -- it's
7   information that's obtained during due diligence and
8   it's information for other detectives that do due
9   diligence in the future do not duplicate the work and
10  they know what's going on with the case.
11       Q.    Okay.  So it was email from 9-7, 9-11.  And
12  then the next one I think is from Detective Quijano
13  that says:
14            "Sorry we could not help further.
15       Please keep me posted."
16            Then we have an email -- subsequent
17  email -- is this an email from you on September 14,
18  2007 that begins "Hello Detective Garcia"?
19       A.    Yes.
20       Q.    Okay.  All right.  So what was your
21  expectation when you were -- that Detective Garcia
22  would do when you were writing this?
23       A.    There's no other option.  All my -- I had
24  exhausted all my avenues to try to amend this
25  warrant.  They did not want my information.  They

                                        Page 49

1    wanted to speak with Detective Garcia directly.  Once

2    again, because she was still working, she was still

3    on the job and she was the one that obtained the

4    warrant originally.

5         Q.    Okay.  And who is -- which -- who were the

6    recipients of this -- of this message?  It's directed

7    to Detective Garcia.  Did you send it to anyone else?

8    Did you send it to Detective Quijano?

9         A.    I don't recall specifically but knowing how

10   I do work, she would -- definitely would have been

11   cc'd on that email.

12        Q.    Okay.  All right.  So this is 9-14.  Then

13   we have -- okay.  So email from detective Quijano

14   that says:

15             "Rog on that and I will make a FU

16        call for you."

17             Is FU follow-up call?

18        A.    Correct.

19        Q.    What did you understand her to mean by

20   this?

21        A.    That she was going to call the district

22   attorney's office or speak with Garcia.

23        Q.    Okay.  Did you ever check if that had been

24   done?

25        A.    Check if what had been done?

                                          Page 50

1    Q.    If she made a follow-up call.

2    A.    No.  Not that I recall, sir.

3    Q.    Okay.  When was your last involvement in

4    this due diligence process?

5    A.    According to my emails, around

6    September 14th, 2007.

7    Q.    Okay.  Did you cc anyone else in juvenile

8    division -- well, yeah -- who would you have

9    addressed this email to, the one that begins "Hello

10    Detective Garcia"?

11    A.    What do you mean?  If it's addressed to

12    Detective Garcia it would have been addressed to

13    Detective Garcia.

14    Q.    Right.  Who would have been cc'd or

15    otherwise emailed with this -- with this

16    correspondence?

17    A.    Like I said earlier, it would have been

18    Detective Quijano who is the DIII of the division.

19    Q.    Okay.  Is there anybody else?

20    A.    No.

21    Q.    All right.  And you mentioned that you

22    understood -- that I think you understood that

23    Detective Quijano would take care of it from -- well,

24    let me rephrase.

25          What did you understand was going to happen

Page 51

1   next after you provided this -- this information in

2   your September 14 email?

3        A.   Once again, these emails are just a recap

4   to document what was going on.  Detective Quijano was

5   in the office so I also had conversations with her.

6   What I understood is that her and Garcia will take

7   care of it.  Once again, I had exhausted all my

8   avenues to attempt to fix this warrant.  It was not

9   up to me at that point.

10            The document was submitted.  They -- Garcia

11   would have to do it, provide a statement and Quijano

12   as a DIII, as the DIII, OIC had to make sure that was

13   completed.

14        Q.   Okay.  And how long -- and why did you

15   understand that to be what would happen?

16        A.   Because that's their job and it's because I

17   talked to them.  Or not Garcia, but Quijano.

18        Q.   Okay.  When you say you talked to them, to

19   Quijano, did Quijano indicate to you that other than

20   making a follow-up call that she would make sure the

21   warrant was amended?

22            MR. RAMIREZ:  Calls for speculation.

23            But you can answer as to what you

24   understand.

25            THE WITNESS:  I don't recall.  Like I said,

Page 52

1          I, JARDENE L. PLATT, RPR, CSR No. 3724 in and

2     for the State of California, do hereby certify:

3          That prior to being examined, the witness named

4     in the foregoing deposition was by me duly sworn to

5     testify as to the truth, the whole truth, and nothing

6     but the truth.

7          That said deposition was taken before me at the

8     time and place therein set forth and was taken down by

9     me stenographically and thereafter transcribed via

10    computer-aided transcription under my direction and is

11    a true record of the testimony given, all done to the

12    best of my skill and ability.

13         Before completion of the deposition, review of

14    the transcript [XX] was [ ] was not requested.

15         I further certify that I am neither counsel for,

16    nor related to, any party to said action, nor

17    interested in the outcome thereof.

18         IN WITNESS WHEREOF, I have hereunto subscribed

19    my name.

20    Dated:  February 23, 2021

21

22

23

24         JARDENE L. PLATT, RPR, CSR No. 3724

25

Page 67

# EXHIBIT 7(FILED UNDER SEAL)

# EXHIBIT 8(FILED UNDER SEAL)

# EXHIBIT 9(FILED UNDER SEAL)

# EXHIBIT 10

12    the investigation which involved the warrant.

13        Q    Okay.  Do you remember about what time that

14    happened or about the date that happened?

15        A    No I don't recall.

16        Q    Would that be to your LAPD e-mail address or to

17    a different e-mail address?

18        A    It would be to my LAPD e-mail address.

19        Q    So have you had any other communications

20    regarding this warrant?

21        A    Not that I can recall.

22        Q    So you said Lugo sent you an e-mail and you

23    don't believe that you responded to it do you know

24    either way whether you did or did not respond to it?

25        A    No.

                                                    10

↟

1        Q    All right what is your current position with

2    the LAPD?

3        A    I'm retired.

4        Q    Okay and what what day did you retire?

5        A    March 31st of 2020.

6        Q    Did you re -- retire for any reason connected

7    with this lawsuit?

8      A   No.

9      Q   Did you require -- retire for any reason

10  connected with the -- the warrant at issue in this

11  lawsuit?

12     A   No.

13     Q   And so prior to March actually I think this

14  would be faster if you could just walk me through the

15  roles that you had with the LAPD beginning with your

16  first and let me know the date of those?

17     A   I couldn't be specific with the dates.

18     Q   Uh-huh?

19     A   I entered the police academy February of 1990

20  left the police academy in August of 1990 to southwest

21  division was at southwest division for a year in 1991 or

22  1992 I went to Newton division I was at Newton division

23  maybe four or five years before I went to juvenile

24  division from juvenile division I went to southeast

25  division and I was.

                                                          11

↥

1      Q   And when?

2      A   I'm sorry.

3      Q   And when did you move from juvenile division to

17        Q    All right do you recall looking at any

18   particular DMV information prior to filling out the

19   warrant information sheet?

20        A    No I don't recall.

21        Q    Do you recall looking at this document document

22   which is JER-COLA 307 before filling out a warrant

23   information sheet?

24        A    I don't recall.

25        Q    Okay so this document appears to be received on

40

1    February 6, 2001 correct?

2         A    Yes it's dated February 6, 2001.

3         Q    So that would be the time this inquiry was run

4    correct.

5         A    Yes.

6         Q    All right so it's the same day the case was

7    reassigned to you correct?

8         A    I don't recall I'd have to go back to find the

9    the date it was reassigned can I go back?

10        Q    Do you know do you know so there's a portion

11   that says Solis is that an officer that requested the

12   the master inquiry?

13       A    No that's my maiden name.

14       Q    That's your maiden name okay then I take it

15  that's you that requested this?

16       A    Yeah.

17       Q    Is that right okay do you -- all right.  Do you

18  recall what you did with this information?

19       A    No.

20       Q    All right.

21            MR. HURRELL:  John can we take a few minute --

22  few minute bathroom break in a few minutes.

23            MR. WASHINGTON:  That's fine.

24            MR. HURRELL:  All right.

25            MR. WASHINGTON:  Okay we can go back on if

                                                        41

1  everyone else is ready.

2            MR. HURRELL:  We're all set.

3            MR. WASHINGTON:  All right.  All right I'm

4  going to introduce another exhibit I believe we're at

5  four now.

6  BY MR. WASHINGTON:

7       Q    Okay so this is Bates stamps JER-COLA 272 to

8  273 so Detective Garcia do you recognize this document?

44

1        A    Not that I recall.

2        Q    Do you have any reason to believe that anyone

3    else altered it?

4        A    Someone altered it I don't I don't know who

5    altered it but someone did.

6        Q    Do you recall putting in a date other than

7    January 5th on this document?

8        A    No.

9        Q    Okay all right do you recall why you put this

10   height weight and driver's license number?

11       A    I'm going to guess it was off the DMV printout.

12       Q    Okay.  It's not a guess correct?

13       A    Correct I never met the suspect.

14       Q    All right well in other words you're guessing

15   that that's what you did but you have no recollection of

16   this at all?

17       A    Yes.

18       Q    Correct?

19       A    Correct.

20       Q    Okay.  All right so do you recall why you put

21   the name Juan Esteban Rodriguez in this the document?

22    A   No.

23    Q   Do you recall why you put the address 600 West

24   Avenue 27 in this document?

25    A   No.

45

1    Q   Okay all right did you before filling out this

2   warrant information sheet did you check if the if Juan

3   Esteban Rodriguez had any prior criminal criminal

4   record?

5    A   I don't recall.

6    Q   Did you look at a photo for for this person

7   Juan Esteban Rodriguez?

8    A   I don't recall.

9    Q   Did you show a photo to the victim or witnesses

10   in this case to ask the person identified here was the

11   suspect?

12    A   No I don't recall.

13    Q   Is that normally something that's done in a in

14   a investigation?

15    A   Usually the victim knows the suspect so no we

16   don't show his photo.

17    Q   Okay so then they obviously obviously the most

18  reliable information would be the information provided

19  by the suspect -- by the victim or witness is that

20  right?

21      A   Yes.

22      Q   Okay all right looking for an exhibit okay this

23  will be Exhibit 5 which is Bates stamped Plaintiff zero

24  four to zero nine Detective Garcia do you recognize this

25  document?

46

1       A   No.

2           MR. HURRELL:  I'm handing her the exhibit John.

3           MR. WASHINGTON:  Okay.

4           MR. HURRELL:  It's a it's a little different

5   than let me see it just make sure this is the same thing

6   it's not actually so I'll have her look at the one on

7   the screen okay.

8   BY MR. WASHINGTON:

9       Q   Okay if you want me to scroll just let me know.

10      A   Yes scroll please.

11      Q   Okay so I'm moving to Plaintiff's five.

12      A   Okay.

13      Q   Scroll to the next page?

22    A   No.

23    Q   Do you recall why you put the address 600 West

24  Avenue 27 in this document?

25    A   No.

45

1    Q   Okay all right did you before filling out this

2  warrant information sheet did you check if the if Juan

3  Esteban Rodriguez had any prior criminal criminal

4  record?

5    A   I don't recall.

6    Q   Did you look at a photo for for this person

7  Juan Esteban Rodriguez?

8    A   I don't recall.

9    Q   Did you show a photo to the victim or witnesses

10  in this case to ask the person identified here was the

11  suspect?

12    A   No I don't recall.

13    Q   Is that normally something that's done in a in

14  a investigation?

15    A   Usually the victim knows the suspect so no we

16  don't show his photo.

17    Q   Okay so then they obviously obviously the most

18    reliable information would be the information provided

19    by the suspect -- by the victim or witness is that

20    right?

21        A    Yes.

22        Q    Okay all right looking for an exhibit okay this

23    will be Exhibit 5 which is Bates stamped Plaintiff zero

24    four to zero nine Detective Garcia do you recognize this

25    document?

                                                              46

↑

1        A    No.

2            MR. HURRELL:  I'm handing her the exhibit John.

3            MR. WASHINGTON:  Okay.

4            MR. HURRELL:  It's a it's a little different

5    than let me see it just make sure this is the same thing

6    it's not actually so I'll have her look at the one on

7    the screen okay.

8    BY MR. WASHINGTON:

9        Q    Okay if you want me to scroll just let me know.

10       A    Yes scroll please.

11       Q    Okay so I'm moving to Plaintiff's five.

12       A    Okay.

13       Q    Scroll to the next page?

18    reliable information would be the information provided

19    by the suspect -- by the victim or witness is that

20    right?

21        A    Yes.

22        Q    Okay all right looking for an exhibit okay this

23    will be Exhibit 5 which is Bates stamped Plaintiff zero

24    four to zero nine Detective Garcia do you recognize this

25    document?

                                                              46

1        A    No.

2             MR. HURRELL:  I'm handing her the exhibit John.

3             MR. WASHINGTON:  Okay.

4             MR. HURRELL:  It's a it's a little different

5    than let me see it just make sure this is the same thing

6    it's not actually so I'll have her look at the one on

7    the screen okay.

8    BY MR. WASHINGTON:

9        Q    Okay if you want me to scroll just let me know.

10       A    Yes scroll please.

11       Q    Okay so I'm moving to Plaintiff's five.

12       A    Okay.

13       Q    Scroll to the next page?

14    A    Oh, please yes.

15    Q    (Complies)

16    A    Okay.

17    Q    Okay.  Do you recognize the declarant -- the

18    signature of the declarant and the complainant in this

19    document?

20    A    No.

21    Q    Okay so it's not your signature?

22    A    No.

23    Q    All right do you know whose signature that is?

24    A    No.

25    Q    Okay and the IO would be the investigating

                                                          47

1    officer and that would be you correct?

2    A    Yes my name is there.

3    Q    Do you remember anyone else who would have

4    signed the complaint for this warrant?

5        MR. HURRELL:  Does she know who signed it you

6    mean.

7    BY MR. WASHINGTON:

8    Q    Yeah are you aware of anyone else who would

9    have signed this document than you.

11    A   It's not more significant they're both

12   significant and you would use you would probably use

13   both for the paperwork.

14    Q   Okay.  Are you aware of any reason why it would

15   have been appropriate to rely on the DMV printout to

16   generate the information in a in the warrant information

17   sheet here?

18        MR. HURRELL:  Objection it calls for

19   speculation.

20   BY MR. WASHINGTON:

21    Q   You can answer?

22    A   In regards to this case.

23    Q   Yes?

24    A   No I don't.

25    Q   Okay.  So in other words if you have a

                                                          54

1   follow-up investigation report and you have a DMV pull

2   and they're conflicting I take it the thing would be and

3   the only well scratch that you have a conflicting

4   follow-up investigation report and a DMV report where

5   the identifiers differ and typically it would only be

6   appropriate to use the information in the follow-up

7    investigation report; is that right?

8         A    No that's not correct they're both significant

9    so you'd look at both and try to resolve whatever issue

10    you find.

11         Q    Okay and how would that be resolved typically?

12         A    You can run the DMV license again you can run a

13    social security number you can run a rap sheet which is

14    an arrest record you can speak with the victim or in

15    this case a victim's parent to see if they have any

16    information relevant to driver's license number.

17         Q    Okay are you aware of whether any of these

18    things were done in this case?

19         A    I don't recall.

20         Q    All right.  All right we're going show another

21    exhibit moving on to Exhibit 8 all right so then Exhibit

22    eight Detective Garcia do you recognize this document?

23         A    I've seen it before yes.

24         Q    Okay do you recall what if any role this played

25    in your decision to to file the warrant information

1    sheet as you did?

2         A    No.

3      Q   Okay all right did you ever speak to the

4  victim's about any kind of discrepancy in height weight

5  or any other information between what was on the the

6  follow-up investigation report and what was in your

7  warrant information sheet?

8      A   I don't recall.

9      Q   Okay.  All right do you ever do due diligence

10 scratch that did you ever do a due diligence in this

11 case?

12     A   Yes.

13     Q   And when was that?

14     A   I'd have to refresh my memory by looking at the

15 paperwork.

16     Q   All right all right I'll give you an exhibit

17 then well did you do more than one?

18     A   I don't recall.

19     Q   Okay well, what's your understanding of the

20 function of a due diligence investigation?

21     A   Due diligence investigation is just to make

22 sure that the suspect information as far as the warrant

23 is concerned is still in the system it's still active

24 it's still valid to check with the victim or the

25 victim's parent to make sure that there's no new leads

1    there's no new information regarding the suspect and if

2    there's any new information regarding the victim's

3    location or where to notify them in case the suspect is

4    arrested.

5        Q    Okay.  Did is any -- is the function of a due

6    diligence investigation ever to ensure that the

7    information contained in a warrant is accurate?

8        A    Usually the -- you believe the information to

9    be accurate so if you run the DMV again and the DMV

10   information matches or or social security number

11   whatever identifying number you have matches the

12   information on the warrant that's usually how you make

13   sure that the warrant is still valid.

14       Q    And as part of this process looking at the

15   documents in the warrant package by the time you are

16   completing your due diligence investigation?

17       A    Yes you you look through the documents in the

18   due diligence package.

19       Q    Okay all right give me a moment I'm going to

20   introduce Exhibit nine okay all right so is this a due

21   diligence investigation completed by you and this is

22   JER-COLA 182 to 186?

23       A    Yes.

24    Q   All right all right so from did you conclude

25    that the suspect was living in Mexico at this time?

57

1     A   Yes the document states that the mother stated

2     she last heard suspect was living in Mexico.

3     Q   Okay did you change the address on the warrant?

4     A   No.

5     Q   Did you seek extradition in the warrant?

6     A   No.

7     Q   Okay.  And why was that?

8     A   The last known address of the suspect was

9     probably what was on the warrant sheet.

10    Q   Okay but my understanding is from the from this

11    document and the follow-up investigation both confirmed

12    that the suspect was living in Mexico right?

13    A   No it doesn't confirm he was living in Mexico.

14    Q   Okay.

15    A   He was last -- she last heard he was in Mexico

16    it doesn't confirm he was in Mexico.

17    Q   Okay did you do anything else to confirm

18    whether he was in Mexico?

19    A   No.

24     Q   All right all right so from did you conclude

25   that the suspect was living in Mexico at this time?

                                                        57

↑

1      A   Yes the document states that the mother stated

2   she last heard suspect was living in Mexico.

3      Q   Okay did you change the address on the warrant?

4      A   No.

5      Q   Did you seek extradition in the warrant?

6      A   No.

7      Q   Okay.  And why was that?

8      A   The last known address of the suspect was

9   probably what was on the warrant sheet.

10     Q   Okay but my understanding is from the from this

11   document and the follow-up investigation both confirmed

12   that the suspect was living in Mexico right?

13     A   No it doesn't confirm he was living in Mexico.

14     Q   Okay.

15     A   He was last -- she last heard he was in Mexico

16   it doesn't confirm he was in Mexico.

17     Q   Okay did you do anything else to confirm

18   whether he was in Mexico?

19     A   No.

20      Q   Did you have any reason to dispute that he was

21   in Mexico?

22      A   No.

23      Q   Okay so then why was it why did you not request

24   the extradition?

25      A   Because again we weren't sure if he was in

                                                                    58

1   Mexico or not.

2      Q   And why weren't you sure what lead you to

3   believe he was not?

4          MR. HURRELL:  Well, what what would lead her to

5   believe that he's not in Mexico?

6   BY MR. WASHINGTON:

7      Q   Yeah I think your testimony is you weren't sure

8   if he was in Mexico correct?

9      A   The only information we had was from mother who

10   said she saw him in or she thought he was living in

11   Mexico.

12      Q   Okay so did you have any well if you have no

13   reason to dispute that then why wasn't why didn't you

14   make efforts to extradite the subject?

15      A   I don't know.

16      Q   Okay all right okay were you ever informed that

17   this warrant needed to be amended?

18      A   Yes.

19      Q   Okay.  And when was that?

20      A   I don't recall.

21      Q   Who was it -- who informed you of this?

22      A   Detective Quijano.

23      Q   Okay did you also receive anything from

24   Detective Lugo informing you of this?

25      A   Yes.

                                                        59

♠

1      Q   All right and what was that was that an e-mail?

2      A   An e-mail.

3      Q   Okay all right if you can give me one moment do

4   you recall if that was in 2007?

5      A   I don't recall.

6      Q   These are the e-mails you reviewed in

7   preparation for this investigation -- or I'm sorry in

8   preparation for this deposition; is that right?

9      A   Yes.  Yes.

10      Q   All right I apologize I'm having difficulty

11   getting these so give me one moment if you need to take

12    a break that's fine too but it should take me a minute

13    or two to locate those communications?

14         MR. HURRELL:  All right I'll be back in a

15    minute okay.

16         MR. WASHINGTON:  Okay.

17    BY MR. WASHINGTON:

18       Q   So I'm going to show you what is Exhibit ten

19    these this is JER-COLA 135 to 137 and before I get into

20    this do you remember the substance of your

21    communications with either Detective Quijano or Lugo in

22    2007?

23       A   I remember some with Detective Quijano I don't

24    believe I had any with Detective Lugo.

25       Q   Okay.  Are you sure that you have -- did not

                                                        60

1     have any or is -- or you just don't recall any?

2        A   I I don't recall any.

3        Q   Okay so -- so are these e-mails you received by

4     which I mean the e-mails on JER-COLA 135 and 136 I can

5     scroll if you'd like?

6        A   These don't seem to be e-mails to me.

7        Q   Okay how about on 136 the one that says hello

8    Detective Garcia?

9        A   Yes.

10       Q   Okay is that an e-mail you received from

11   Detective Lugo?

12       A   Yes.

13       Q   Okay.  Do you recall Detective Quijano ever

14   telling you there was nothing more for you to do to

15   amend the warrant?

16       A   I don't recall.

17       Q   Okay what was it what if anything do you recall

18   about your communications with Detective Quijano about

19   this warrant?

20       A   Detective Quijano and I spoke on the telephone

21   and then I eventually went to juvenile division to look

22   through the package there was an issue regarding the

23   birthdate of the suspect so I I told her I didn't recall

24   any of the information.  The warrant package was passed

25   to me from Detective Beardsley.

                                                      61

↑

1        Q   Okay all right okay and what -- so did you ever

2    take any steps to amend this warrant?

3        A   No.

4          Q   All right.  Did you ever have a conversation in

5     which in which Detective Quijano you did not need to

6     amend the warrant?

7          A   Yes.

8          Q   What was that conversation?

9          A   We spoke about my current assignment which was

10    internal affairs division and that I was no longer part

11    of juvenile division that Detective Lugo was in charge

12    of the due diligence team he encountered the error and

13    that he would amend the error.

14         Q   So your understanding is detective is Detective

15    Quijano well do you understand that that was ever

16    communicated to Lugo?

17         A   I don't know Detective Quijano is or was

18    Detective Lugo's supervisor.

19         Q   Okay is this documented anywhere that you

20    recall this this conversation you had with Quijano?

21         A   I did not document it I don't know if Detective

22    Quijano did.

23         Q   Okay.  All right and when was the first time

24    you recall this conversation with Quijano?

25              MR. HURRELL:  When was this first time she

                                                          62

1   what?

2       A   Recalled this conversation with Quijano.

3           MR. HURRELL:  I'm -- I'll object it's vague and

4   ambiguous I'm not sure I understand.

5   BY MR. WASHINGTON:

6       Q   You can answer.

7       A   It was in 2007 some time.

8       Q   So in other words you were asked by internal

9   affairs about your communications with Quijano in

10  regards to this and you did not reference the

11  conversation you described in here why was that?

12          MR. HURRELL:  Objection it's argumentative go

13  ahead.

14          THE WITNESS:  I don't recall them asking me

15  anything about that.

16  BY MR. WASHINGTON:

17      Q   So you don't recall them asking you about your

18  communications with Quijano or Lugo in your internal

19  affairs investigation is that right?

20      A   I'm sure they must have but I don't recall.

21      Q   Okay do you have any reason why you wouldn't

22  have told them what you're telling me today?

23      A   No.

24      Q   All right.  Did you ever communicate with Lugo

25   that you were not going to be amending the warrant?

63

1        A   I don't recall.

2        Q   So you have an e-mail that says he cannot and

3   it requires you your testimony is that you didn't

4   discuss it further with him is that right?

5        A   That is correct I discussed it with his

6   supervisor.

7        Q   Okay.  All right and so what did his supervisor

8   say as to why well scratch that his supervisor is

9   Quijano is that right?

10       A   Yes.

11       Q   So what did his supervisor say as to -- as to

12   how what he's identified in his e-mail to you is going

13   to be addressed?

14       A   We didn't talk about his e-mail.

15       Q   Well, in other words you knew that he told you

16   there was no way he could address it?

17       A   No the e-mail that you're talking about says DA

18   Blissert states that you the I/O will probably have to

19   provide a statement.

20       Q   Okay?

1        Q   Did you read it at the time it was -- at the

2   day it was sent to you?

3        A   I don't know if I read it the day that it was

4   sent to me.

5        Q   Do you remember about when you read it?

6        A   No.

7        Q   Was it I guess I assume it's part of your

8   conversation with Quijano in any way; is that correct?

9        A   No I believe I spoke with Quijano prior to the

10  e-mail.

11       Q   Okay did you speak to Quijano after it?

12          MR. HURRELL:  I'm sorry I didn't hear that

13  John.

14  BY MR. WASHINGTON:

15       Q   Did you speak to Quijano after the e-mail was

16  sent to you?

17       A   I don't recall.

18          MR. WASHINGTON:  Okay all right that's it for

19  me.

20          MR. HURRELL:  All right and Ms. Reporter if I

21  could get a copy, please thank you.

22          MR. GORDON:  If we could get a copy of that as

23  well please.

24

# EXHIBIT 11(FILED UNDER SEAL)

# EXHIBIT 12

13        Q.    Sure.  I'm just trying to understand if the

14    policies -- well, we'll start with training.  If the

15    training that's given to officers have changed from 1999

16    to present with respect to, let's say, inputting a

17    warrant.

18            MR. RAMIREZ:  May call for speculation.

19            THE WITNESS:  No, they have not.  Oh.

20            MR. RAMIREZ:  May call for speculation but you

21    may respond, Detective.

22            THE WITNESS:  Not to my knowledge.  No, I

23    believe they're the same.

24    BY MR. WASHINGTON:

25        Q.    Okay.  And same with respect to policies for

                                                            4

1     inputting the warrant?

2            MR. RAMIREZ:  Same objection, but you may

3     respond if you can.

4            THE WITNESS:  Isn't that the same question you

5     just asked me?

6     BY MR. WASHINGTON:

7        Q.    I think the first question was trainings.

8        A.    The second one was policies?

9        Q.    Yeah.

10      A.   No, sir, there's not, to my knowledge.

11      Q.   All right.  So I assume that that's the same

12  for maintaining the warrant?  In other words, there's

13  not been -- or let me rephrase that.

14          Has LAPD had the same policies for correcting a

15  warrant from 1999 to present?

16          MR. RAMIREZ:  May call for speculation, but you

17  may respond if you can, Detective.

18          THE WITNESS:  Are you asking if there was

19  training on that or --

20  BY MR. WASHINGTON:

21      Q.   No, I'm just asking, before I get into the

22  trainings, if there's been -- if it's been the same set

23  of trainings or if it has changed from 1999 to present,

24  with respect to correcting a warrant?

25      A.   No.  It would be the same training.

                                                          5

1       Q.   So I assume that's also true for policies,

2   right?

3       A.   Correct.

4       Q.   How long have you spent preparing for this

5   deposition?

6      A.   This one today?

7      Q.   Yes.

8           MR. RAMIREZ:  Objection as to relevance, but

9    you may respond.

10          THE WITNESS:  I've had a few conversations with

11   my attorneys and then I reviewed material from our prior

12   deposition.

13   BY MR. WASHINGTON:

14     Q.   By that do you mean the transcript of the

15   deposition?

16     A.   Yes.

17     Q.   I just received by e-mail what appears to be a

18   timeline.  Did you review that as well?

19     A.   Yes, sir.

20     Q.   The timeline refers to particular documents by

21   Bates stamps.  Did you refer to those documents as well

22   as the timeline?

23     A.   No, I did not.

24     Q.   So I think that's the deposition transcript,

25   the timeline we referenced, and let me introduce the

6

1    timeline as an exhibit actually.  All right, Ms. Nadeau,

2    I'm sending you Exhibit 1.

```
 3              (Plaintiff's Exhibit 1 was marked for

 4              identification.)

 5              MR. SHARABY:  Can you send me that as well?  I

 6    can give you my e-mail.

 7              MR. WASHINGTON:  Yes.  I think I can just start

 8    a chain here with everybody and then I will CC everyone

 9    who's in attendance.  So what is your e-mail address?

10              MR. SHARABY:  So it's F and it's Sharaby, my

11    last name, @HurrellCantrall.com.

12    BY MR. WASHINGTON:  Actually, I'm not sure

13    technologically here what's the best way to get you

14    these exhibits, Detective Byrne.  I can send you an

15    email as well.  I don't know if it would work and

16    communicate them.  Whatever works best, but just let me

17    know.

18              THE WITNESS:  I think she said she could share

19    them.

20              THE REPORTER:  No, it would be counsel sharing

21    them.

22              MR. WASHINGTON:  Oh, all right.

23              (Off-record discussion with reporter.)

24    BY MR. WASHINGTON:

25         Q.   Detective Byrne, can you see a document labeled
```

7

21    the warrant and then Detective Figueira and Detective

22    Robles ensured that the warrant was corrected in our

23    LAPD database, and then I ensured that when the warrant

24    was corrected in both the county system and our

25    database, Detective Figueira gave me a call and then I

16

1     relayed that to my attorney Mr. Gordon, and he was

2     satisfied.

3           We did a printout of the new warrant and Juan

4     Esteban Rodriguez, the Esteban had been removed and I

5     believe they added a Zuniga as an additional last name.

6     And then Mr. Juan Esteban Rodriguez's CDL was also

7     removed from the warrant information, and I was

8     satisfied that it had finally been taken care of and as

9     well as Mr. Gordon.

10    Q.    Okay.  So prior -- and do you remember the date

11    when that correction was made?

12    A.    Sometime in December of 2000.  Again, I was

13    recovering from hip replacement surgery and I was having

14    telephonic conversations with my D-II who is rock solid,

15    and after we got him involved, he was able to ensure

16    that this was taken care of.

17          MR. RAMIREZ:  My only objection is to the date.

18    I think you said 2000.  I just want to make sure we have

19    the right date.

20          THE WITNESS:  Yeah, it's 2020.  I'm sorry.

21          MR. RAMIREZ:  Thank you.

22    BY MR. WASHINGTON:

23    Q.    So prior to that time, my understanding is that

24    the warrant had the name Esteban and the OLN for Juan

25    Esteban Rodriguez; is that correct?

17

1     A.    Up until December of 2020?  Yes, it did.

2     Q.    I'm going to introduce another exhibit.  Before

3     I get to that, actually, so what interactions -- I think

4     you described interactions between LAPD officers.  What

5     interactions, if any, were there with the court that

6     you're aware of?

7     A.    All I know is that from what I was told by

8     Detective Figueira, that D-III Criswell went before the

9     courts.  I have no further information beyond that, and

10    that's hearsay to me because I haven't spoken with her

11    directly.

18

12    Q.    Are you aware of any attempts to modify the

13    warrant between the time of Mr. Rodriguez's arrest or

14    detention and December 2020?

15        A.    Yes.

16        Q.    And if you'd please describe each of those.

17        A.    Well, we contacted Mr. Rodriguez on April 9th

18    of 2018, and on that day myself and Detective Figueira

19    had conversations with a Detective Perez, Detective II

20    Perez from juvenile division, and I believe he worked on

21    having -- initially worked on having the warrant

22    corrected.

23        Q.    What steps did he take to do so, that you're

24    aware of?

25        A.    Based on a report that he generated, on April

                                                                    23

1    12th, 2018 he telephonically contacted the Los Angeles

2    County Court Clerk's office and spoke with a Maria who

3    advised him Mr. Juan Esteban Rodriguez would need to go

4    to the clerk's office with the case number, and then

5    Mr. Rodriguez would be sent to a judge who would issue a

6    judicial clearance for wrong person certificate.

7            And I believe on April 18th D-II Perez

8    contacted Mr. Rodriguez and advised him of the above.

9    And then again in October, or approximately October 24

10   of 2019, Detective Perez must have learned that the

11   warrant hadn't been corrected and he attempted to remedy

12   the warrant again, but again he was unsuccessful.

13       Q.   Do you have any documents in front of you right

14   now?

15       A.   Yes, I do.

16       Q.   And which documents are those?

17       A.   It's some notes I took.

18       Q.   Would you mind holding those to the camera?

19       A.   It's just my self-written notes of the

20   timeline.

21       Q.   If we could get a copy of this as well?

22       A.   I can send that over to Mr. Gordon on Monday

23   when I'm back to work if you'd like.

24       Q.   Okay.  All right.  So you mentioned that Mr. --

25   or that Detective Perez made some attempts on October

24

19    I didn't review any other documentation to confirm that

20    that was correct or not.

21        Q.   Okay.  And when you made the modifications to

22    the warrant though at that point in December of 2020,

23    the OLN was -- the OLN was still associated with the

24    warrant, correct?

25        A.   On our internal flier, I believe so, yes.

                                                              31

1        Q.   And with respect to the warrant?

2        A.   I can't say with certainty, but I'm reasonably

3    certain it was also in the warrant system, the county

4    warrant system.

5        Q.   We can take a break now, Gene.  How much time?

6             MR. RAMIREZ:  Take like five.

7             MR. WASHINGTON:  Okay.

8             (Break taken.)

9    BY MR. WASHINGTON:

10        Q.   So, Detective Byrne, are you aware of any

11    documents that were generated in December of 2020 as

12    part of amending the warrant?

13        A.   No, sir.  Again, I was home IOD, and kind of

14    quarterbacking it from home.  Kind of gave the

15    responsibility to Detective Figueira, and once it was

16    done, once it was corrected and completed, he verbally

17    gave me a heads-up and then provided me with a copy of

18    the updated warrant sheet from the courts indicating or

19    confirming that it was corrected.

20        Q.   Do you know whether he submitted any document

21    to amend the warrant?

22        A.   He just ensured that it was corrected within

23    our system.

24        Q.   Well, again --

25        A.   Again, it was --

                                                              32

1         Q.   -- do you know if anyone from juvenile division

2    submit any document to amend the warrant?

3         A.   No.  No, I don't.

4         Q.   Do you know which officers, if any, are

5    necessary to amend an existing warrant?  Is a particular

6    officer required?

7              MR. RAMIREZ:  That's vague and ambiguous, but

8    if you understand, you may respond.

9              THE WITNESS:  It usually falls on the

10    responsibility of the original investigating officer if

11    he or she was still in the division, but ultimately it's

12    the Detective III that's running the table.

13    BY MR. WASHINGTON:

14        Q.    So can a supervisor -- if for whatever reason

15    the investigating officer is not going to appear before

16    the court, can a supervisor or another officer do so to

17    amend the warrant?

18        A.    Based on this case, that's ultimately what

19    happened.  Detective Lugo was told by someone in the

20    courts that he was working with that Garcia had to go

21    before the courts, and that never happened.

22             And then 14 years later Detective Criswell or

23    someone in her command went before the courts and

24    ultimately had the warrant corrected.

25        Q.    So there's no reason another -- an officer

33

1    other than the investigating officer could not cause a

2    warrant to be amended, is that right, that you're aware

3    of?

4        A.    I would say if the original IO of the

5    investigation couldn't be -- couldn't take care of it,

6    it would be the responsibility of a supervisor in that

7    section or working that table would be -- could go

43

1    and to the right a slight bit.  I don't think that's

2    related to the warranty.  I think that's just something

3    that's generated in the return of a master inquiry.  But

4    the remainder of it is the warrant in this case.

5        Q.   So I take it the N is something like name, and

6    then this is the name and all their information?

7        A.   Yeah.

8        Q.   So in other words, the address on the warrant

9    is 600 West 27th Avenue, correct?

10       A.   Yes.

11       Q.   So if we go to the next page, JER-COLA 236,

12   this appears to be a DMV record that is pulled for -- as

13   part of this due diligence; is that correct?

14       A.   Yes.

15       Q.   And so the address for this driver's license

16   number is South Normandy Avenue in Gardena, correct?

17       A.   As of December 30th, 2004, yes.

18       Q.   Were you aware of any time that the address for

19   this warrant changed?

20       A.   Well, if you go back to the previous page, that

21   was the address submitted to the court on the felony

22   warrant sheet.  I don't know where they came up with the

23    600 West 27th Street.  That may be the address where the

24    correct Juan Rodriguez Zuniga lived, but I don't know.

25    But the following page is the address associated with

44

1    Juan Esteban Rodriguez based on his DMV information.

2        Q.   So an officer looking at that would recognize

3    that the address for the warrant and the address for the

4    suspect are not the same, correct?

5            MR. RAMIREZ:  That may call for speculation,

6    but you may respond.

7            THE WITNESS:  I recognize that the information

8    on the top page was originally submitted to the court in

9    2001, and now in 2005 there's another address for Juan

10    Esteban Rodriguez.

11    BY MR. WASHINGTON:

12        Q.   To your knowledge --

13        A.   Does that answer your question?  I'm not sure

14    if that answers your question thoroughly.  People move

15    from when the original warrant was issued.

16        Q.   When that happens does the LAPD require any

17    sort of amendments to the warrant?

18        A.   No.  We would go out and do an investigative

19    door knock to see if the suspect is at the updated

20    address.

21         Q.    Do you know if there had ever been any attempt

22    to enforce the warrant at any address other than the

23    address for Mr. Rodriguez at which he was arrested or

24    detained on -- in 2018?

25         A.    To the best of my knowledge, no.  During the

45

♠

1    core of Lugo's thorough due diligent investigation in, I

2    believe, '07, I believe he contacted both Juan Esteban

3    Rodriguez, Sr. and Juan Esteban Rodriguez and had some

4    sort of telephonic conversation and he was satisfied

5    that Juan Esteban Rodriguez was not the correct suspect.

6         Q.    But before and after there was never any

7    attempt to execute the arrest warrant at any address

8    other than the address at which Mr. Rodriguez was

9    detained in 2018, right?

10        A.    To my knowledge now, no.

11        Q.    Do you have any understanding as to why there

12    was no attempt to execute the arrest warrant at any

13    other address?

14             MR. RAMIREZ:  Calls for speculation, lacks

15    foundation, but you may respond if you can.

16          THE WITNESS:  I do not.

17   BY MR. WASHINGTON:

18       Q.   All right.  So in these due diligence documents

19   where there's an ID with the DMV record and a driver's

20   license number, that's reflecting what the current DMV

21   records are for the address associated with that

22   driver's license; is that correct?

23       A.   Well, on this particular document here, the

24   date that it was printed was March the 22nd, 2005, and

25   then the resident address on 14807 South Normandy is

                                                          46

♠

1    what the DMV had as of December 30th, 2004 and November

2    29th, 2003.  And at some point in time with the DMV

3    Mr. Rodriguez might have shortened the Esteban to just

4    an E, because he does have an AKA there.

5        Q.   I'm going to introduce another exhibit.  I've

6    just e-mailed Exhibit 8.

7            (Plaintiff's Exhibit 8 was marked for

8            identification.)

9    BY MR. WASHINGTON:

10       Q.   I'm going to share it now.  Do you recognize

11   this document?

12       A.   It's a due diligent checklist.

13          Q.    So on JER-COLA, 226 at the top of it that

14    seemed like the same sort of entry here.  Is this a

15    reference to the warrant at issue in this case?

16          A.    Yes, sir, it is.

17          Q.    Do you know if this -- if this due diligence

18    entry resulted in any modification to the warrant?

19          A.    I do not know.

20          Q.    So I understand that this was a due diligence

21    entry in March 6th of 2019; is that correct?

22          A.    Done by a J. Hernandez that's assigned to

23    juvenile division.  That's separate from fugitive

24    warrants section, yes, sir.

25          Q.    Do you understand the due diligence process at

                                                              47

1    the juvenile division?

2          A.    I never worked juvenile division.  I don't know

3    what their policy or procedure in regards to how they

4    conduct due diligence is.

5          Q.    All right.  I'm going to introduce another

6    exhibit.  Before I do that actually, so does Officer

7    Hidalgo work in fugitive warrants section?

8          A.    Yes, he does.

9       Q.   And what is his position there?

10      A.   Currently or in 2018?

11      Q.   Yeah.  In 2018, at the time of Mr. Rodriguez's

12  arrest.

13      A.   Detective Hidalgo was assigned to gang

14  narcotics division, fugitive warrants section, and he

15  was working the central bureau SWAT.

16      Q.   And what was his position hierarchically with

17  respect to yours?

18      A.   He's a Detective I and I'm a Detective III.

19  I'm in a supervisory role and he has no supervisory

20  responsibilities.

21      Q.   What does that mean to have a supervisory role?

22      A.   I'm the supervisor.  I'm in charge of the

23  Central Bureau squad.  I'm responsible for the guys

24  within it.  I'm responsible for the investigations they

25  conduct.  I'm responsible for our actions in the field

48

1   when we're operating as a unit.  Ultimately, like I

2   think I said in our last deposition, the Detective III

3   is responsible for everything that occurs on their

4   table.

5       Q.   So and what was your impression of Officer

20    address.

21        Q.    Do you know if there had ever been any attempt

22    to enforce the warrant at any address other than the

23    address for Mr. Rodriguez at which he was arrested or

24    detained on -- in 2018?

25        A.    To the best of my knowledge, no.  During the

45

core of Lugo's thorough due diligent investigation in, I

1

2    believe, '07, I believe he contacted both Juan Esteban

3    Rodriguez, Sr. and Juan Esteban Rodriguez and had some

4    sort of telephonic conversation and he was satisfied

5    that Juan Esteban Rodriguez was not the correct suspect.

6        Q.    But before and after there was never any

7    attempt to execute the arrest warrant at any address

8    other than the address at which Mr. Rodriguez was

9    detained in 2018, right?

10        A.    To my knowledge now, no.

11        Q.    Do you have any understanding as to why there

12    was no attempt to execute the arrest warrant at any

13    other address?

14        MR. RAMIREZ:  Calls for speculation, lacks

15    foundation, but you may respond if you can.

16          THE WITNESS:  I do not.

17    BY MR. WASHINGTON:

18        Q.   All right.  So in these due diligence documents

19    where there's an ID with the DMV record and a driver's

20    license number, that's reflecting what the current DMV

21    records are for the address associated with that

22    driver's license; is that correct?

23        A.   Well, on this particular document here, the

24    date that it was printed was March the 22nd, 2005, and

25    then the resident address on 14807 South Normandy is

46

1    what the DMV had as of December 30th, 2004 and November

2    29th, 2003.  And at some point in time with the DMV

3    Mr. Rodriguez might have shortened the Esteban to just

4    an E, because he does have an AKA there.

5        Q.   I'm going to introduce another exhibit.  I've

6    just e-mailed Exhibit 8.

7            (Plaintiff's Exhibit 8 was marked for

8            identification.)

9    BY MR. WASHINGTON:

10        Q.   I'm going to share it now.  Do you recognize

11    this document?

12        A.   It's a due diligent checklist.

13          Q.   So on JER-COLA, 226 at the top of it that

14    seemed like the same sort of entry here.  Is this a

15    reference to the warrant at issue in this case?

16          A.   Yes, sir, it is.

17          Q.   Do you know if this -- if this due diligence

18    entry resulted in any modification to the warrant?

19          A.   I do not know.

20          Q.   So I understand that this was a due diligence

21    entry in March 6th of 2019; is that correct?

22          A.   Done by a J. Hernandez that's assigned to

23    juvenile division.  That's separate from fugitive

24    warrants section, yes, sir.

25          Q.   Do you understand the due diligence process at

47

♠

1    the juvenile division?

2          A.   I never worked juvenile division.  I don't know

3    what their policy or procedure in regards to how they

4    conduct due diligence is.

5          Q.   All right.  I'm going to introduce another

6    exhibit.  Before I do that actually, so does Officer

7    Hidalgo work in fugitive warrants section?

8          A.   Yes, he does.

79

1      Q.   And then some circled portion that's not

2   legible and then another portion after that which

3   says -- I think that's address on Lorelei Avenue?

4      A.   Yeah.  5953, I think?

5      Q.   Is that the address at which you went to

6   Mr. Rodriguez's house in 2018?

7      A.   I don't recall.  The address is on the flier.

8   It was in the city of Lakewood.  I don't recall the

9   exact numbers or the street name.  I apologize.

10      Q.   That's fine.

11      A.   That document was printed after our contact

12   with Mr. Rodriguez.  That document was queried and

13   printed on January 23rd of 2019, as stated in the top

14   line saying "date."  And I don't know who did that.

15      Q.   Are you familiar with an internal affairs

16   investigation of this case, the complaint investigation?

17      A.   Yes, I am.

18      Q.   And when did that begin?

19      A.   As soon as you filed the lawsuit.  And that's a

20   standard practice by the department.  Once a lawsuit is

21   generated, an associated personnel complaint is also

22    generated.

23         Q.   Do you know when the investigation concluded?

24         A.   I would say December of 2020 when Detective

25    Figueira, Robles, Mr. Gordon and myself ensured that the

80

1     warrant was finally corrected with the D-III from

2     juvenile division.  Her name slips me at this time.

3     Criswell or something like that.  I would assume that's

4     when it ended.

5          Q.   Go ahead.

6          A.   Are you asking when the personnel complaint was

7     completed?

8          Q.   Well, let's speak more broadly.  So what is a

9     complaint investigation?

10         A.   It's an investigation conducted by an internal

11    affairs division supervisor addressing the allegations

12    of the complaint.

13         Q.   And what is the purpose of such an

14    investigation?

15         A.   I'm no expert in the complaint system or why

16    it's generated.  I've never worked internal affairs.

17              MR. RAMIREZ:  Let me object then that it may

18    call for speculation.  So if you're not sure, don't

19    speculate.

20         MR. WASHINGTON:  To be clear, this is another

21    matter noticed in the PMK deposition and previously

22    discussed.

23         MR. GORDON:  Mr. Washington, I would just state

24    that the intricacies of the complaint management system

25    and the internal affairs investigation are not one of

81

1    the listed categories in either of the two PMK depo

2    notices that you had proffered.

3         There are instances regarding past instances of

4    LAPD's failures to properly input information to

5    warrant, audits pertaining to LAPD officers' failure to

6    properly input information or any investigations or

7    findings pertaining to LAPD officers' failure to

8    properly input warrant package information to a warrant

9    or failure to correct it, but there is not a listed PMK

10   category as to Mr. -- as to Detective Byrne's

11   familiarity with the process in internal affairs or how

12   the document management system is run.

13   BY MR. WASHINGTON:  For one thing, we discussed this

14   specifically by e-mail as part of the complaints, but I

12    around 2001 or 2002 that the suspect for this warrant

13    was in Mexico?

14        A.   Became aware of that after the personnel

15    complaint or lawsuit was filed.

16        Q.   Is that your understanding now?  Because these

17    questions are geared toward you as the expert on what

18    happened to this lawsuit.

19        A.   Yes.  Now.  I'm aware that he was possibly or

20    he was sighted in Mexico by a family member related to

21    the victim.

22        Q.   And in 2007 I believe Lugo sought an

23    extradition warrant; is that correct?

24        A.   I believe so.  Or, yes, he did as a matter of

25    fact.

                                                          90

↑

1        Q.   Do you know -- go ahead.

2        A.   Go ahead.

3        Q.   Do you know if there was any other -- if there

4    was any attempt other than this to extradite -- scratch

5    that.

6             Do you know if there was ever any attempts to

7    extradite the suspect in this warrant other than Lugo's

8    in 2007?

9     A.   Well, Lugo's actions were not an attempt to

10    extradite him back from Mexico, if that's where he was

11    at.  He was just requesting from the district attorney's

12    office to approve extradition.  Then you would have to

13    get the -- if the suspect was in fact in Mexico, he'd

14    have to get the Mexican authorities involved, and that

15    would be something that would go through our foreign

16    prosecution unit.  So I would say no effort was made to

17    extradite Juan Rodriguez Zuniga back from Mexico.

18    Q.   Has there been any effort to --

19    A.   As a matter of fact -- as a matter of fact,

20    when Lugo requested it, it was granted, but then because

21    I believe Garcia never appeared before the court as

22    instructed -- or the court words it something to the

23    effect of someone did respond for further advice but

24    warrant was recalled and reissued the way it was before,

25    so -- and the extradition was also recalled.

91

1          So if extradition hasn't been approved by the

2     district attorney's office, the Los Angeles Police

3     Department isn't going to take any kind of efforts to

4     extradite somebody back from a foreign country or out of

5    state.

6        Q.    Okay.  Had the LAPD ever sought to approve or

7    to obtain approval for extradition by the DA or anyone

8    else other than in 2007?

9        A.    Not to my knowledge.

10        Q.    Why is that?

11        A.    I don't know.

12        Q.    Do you think it's reasonably likely that Juan

13    Rodriguez Zuniga will stay in Mexico?

14            MR. RAMIREZ:  That calls for speculation, lacks

15    foundation, but you can answer if you know.

16    BY MR. WASHINGTON:

17        Q.    Based on your experience.

18        A.    I don't know if he's in Mexico.  He might have

19    gone to Mexico.  He might have come back.  Might have

20    gone to Mexico, might have come back.  The last evidence

21    that the department has is he was sighted by a family

22    member in a small town in the country of Mexico.  But

23    based on my experience suspects hop the border back and

24    forth multiple times a month, a year, and over the

25    length of this warrant God knows where he's at.

92

1        Q.    Do you know of any reason to believe he's

# EXHIBIT 13(FILED UNDER SEAL)

# EXHIBIT 14

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

NO. BA214857                                    PAGE NO.  1
THE PEOPLE OF THE STATE OF CALIFORNIA    VS.    CURRENT DATE 10/24/19
DEFENDANT 01:  JUAN ESTEBAN RODRIGUEZ
LAW ENFORCEMENT AGENCY EFFECTING ARREST: LAPD - JUVENILE DIVISION

BAIL: APPEARANCE  AMOUNT    DATE      RECEIPT OR   SURETY COMPANY    REGISTER
       DATE      OF BAIL   POSTED     BOND NO.                       NUMBER

CASE FILED ON 03/14/01.
 COMPLAINT FILED, DECLARED OR SWORN TO CHARGING DEFENDANT WITH HAVING
 COMMITTED, ON OR ABOUT 11/01/99 IN THE COUNTY OF LOS ANGELES, THE FOLLOWING
 OFFENSE(S) OF:
    COUNT 01: 269(A)(4) PC FEL
    COUNT 02: 269(A)(5) PC FEL
    COUNT 03: 269(A)(5) PC FEL
NEXT SCHEDULED EVENT:
  ARREST WARRANT TO ISSUE

03/15/01 ARREST WARRANT IN THE AMOUNT OF $1,000,000.00 BY ORDER OF JUDGE DAVID

    M. HORWITZ ISSUED. (03/15/01).

03/15/01 ARREST WARRANT IN THE AMOUNT OF $1,000,000.00 BY ORDER OF JUDGE DAVID
    M. HORWITZ ISSUED. (09/24/07).

03/15/01 ARREST WARRANT IN THE AMOUNT OF $1,000,000.00 BY ORDER OF JUDGE DREW
    E. EDWARDS ORDERED/ISSUED. (10/24/19).


ON 09/14/07 AT  800 AM :

  AMENDED FELONY COMPLAINT FOR EXTRADITION FILED ON 9-14-07.
  ********TCIS ENTRY MADE BY SBAUTISTA********
  WARRANT RECALLED AND TO BE REISSUED
ARREST WARRANT TO ISSUE

09/14/07 ARREST WARRANT IN THE AMOUNT OF $1,000,000.00   RECALLED. (09/14/07).


ON 09/24/07 AT  830 AM :

  WARRANT NEEDS TO BE REISSUED BECAUSE OFFICER DID NOT RETURN
  FOR FURTHER INSTRUCTION.  WARRANT WILL NOT BE AMENDED FOR
  EXTRADITION AT THIS TIME.
ARREST WARRANT TO ISSUE


ON 10/24/19 AT  830 AM :

  WARRANT RECALLED TO REMOVED THE OLN ON THE CASE.  WARRANT TO BE
  REISSUED FORTHWITH.

  KO
ARREST WARRANT ISSUED

10/24/19 ARREST WARRANT IN THE AMOUNT OF $1,000,000.00   RECALLED. (10/24/19).

JER-COLA28

# EXHIBIT 15(FILED UNDER SEAL)

# EXHIBIT 16

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JUAN RODRIGUEZ,                )
                                    )
 5               Plaintiff,         ) Case No.
                                    ) 2:19-CV-03985-DMG-PJW
 6          vs.                     )
                                    )
 7   CITY OF LOS ANGELES, et al.,   )
                                    )
 8               Defendants.        )
                                    )
 9   _____)
10
11
12
13
14          ZOOM DEPOSITION OF ROBERT PEREZ
15            THURSDAY, FEBRUARY 18, 2021
16
17
18
19
20
21   REPORTED BY:
     JARDENE L. PLATT,
22   RPR, CSR No. 3724
     Job No. 4469023
23   Pages 1-153
24
25
                                            Page 1
```

1          MR. HURRELL:  You mean when she trains?
2     What subject matter?
3          MR. WASHINGTON:  I'm sorry.  I can't hear.
4     Wait one second.
5          MR. HURRELL:  Do you mean what subject
6     matters she trains?
7          MR. WASHINGTON:  Yeah.
8          THE WITNESS:  She has several training
9     schools that she has.  Effective procedures.
10    Qualifications.  Clearance qualifications.  And each
11    department orders that come up.
12    BY MR. WASHINGTON:
13    Q.   So are you aware of the -- I think you
14    testified that you -- you are involved in the case
15    presentation to the DA and that sort of thing.  Are
16    you aware of what training she does with respect to
17    that?
18    A.   No, I don't.
19    Q.   Okay.  Are you aware of what training she
20    does, if any, with respect to warrant amendment?
21    A.   No, I don't.
22    Q.   So how long have you been in this role of
23    detective II supervisor?
24    A.   I would say approximately five years.
25    Q.   Okay.  What were -- what was your role in

Page 16

1    in the case for candidates for the police department

2    for the new recruits.

3        Q.    Okay.  Did you have any role in LAPD before

4    that?

5        A.    Yes.  I worked patrol.  Southeast Division

6    patrol, which was 2006, seven years.

7        Q.    Okay.  Roughly is -- what was your best

8    estimate for when these six, seven years were?

9        A.    I'm sorry.  Repeat that, please.

10        Q.    Yeah.  What time period was that six to

11    seven years you just described?

12        A.    Between 1991 and '96, '97.

13        Q.    Okay.  Did you do anything with LAPD before

14    patrol?

15        A.    Yes.  I was on probation, originally for a

16    year, year and a half with Foothill Division.

17        Q.    Okay.  Anything before that?

18        A.    The police academy for seven months.

19        Q.    Okay.  When did you attend the police

20    academy?

21        A.    August '89 to February of 1990.

22        Q.    So in your -- in your current role as a DII

23    supervisor, where does that fit within the hierarchy

24    of the juvenile division?

25        A.    Well, there's a police officer.  There's

Page 24

```
 1   right?
 2        A.    Yes.
 3        Q.    Okay.  Who did you speak to with the
 4   district attorney's office?
 5        A.    I don't recall.
 6        Q.    Okay.  What time did you -- what date did
 7   you call them on?
 8        A.    I don't know when I called them but it was
 9   after I spoke -- after this incident with the call.
10   A few days later.  A couple days later.  I'm not
11   sure.
12        Q.    Was it the same day?
13        A.    I'm not sure.
14        Q.    So I can pull up your notes if it's
15   helpful, but your notes suggest an investigation
16   where you spoke to the victim's mother and the
17   victim's grandfather.
18              Was that before or after you spoke to the
19   DA or -- the DA?
20        A.    I don't recall if it was before or after.
21   I did talk to the -- I think the grandpa.  The
22   grandfather of the victim.
23        Q.    Okay.  My apologies.  The notes indicate
24   you received a card from the mother.  So you don't
25   remember who you spoke to at the DA.  Is that right?
```

Page 55

```
 1            A.    I don't recall.
 2            Q.    Did you speak with anyone else about how to
 3    amend the warrant?
 4            A.    I don't recall.
 5            Q.    Okay.  Did you speak with R and I?
 6            A.    I don't think I did the first time.
 7            Q.    What do you mean by the first time?
 8            A.    When this -- when -- initially when I --
 9    after talking to the clerk's office.  I don't
10    recall -- I don't think I talked to anyone.  I don't
11    remember.
12            Q.    Did you talk to them sometime after that?
13            A.    Yes.
14            Q.    When was that?  When was the first time you
15    did?
16            A.    After this incident, I don't know, but like
17    last year sometime or 2019, I believe.
18            Q.    So sometime in 2019 but not 2018.  Right?
19            A.    Not that I can remember.
20            Q.    So your understanding -- I think you
21    reference that the clerk informed you that Juan
22    Rodriguez could get a letter that he would have to
23    carry.  Is that right?
24            A.    Yes.
25            Q.    He would have to carry it because he could
```

Page 63

1    still be rearrested for the warrant.  Right?

2        A.   He could be detained for the warrant.

3        Q.   Okay.  So in other words, it wouldn't

4    actually change the warrant for his arrest.  Right?

5        A.   Yes.

6        Q.   Okay.  So was it your view as far as what

7    was needed to fix Mr. Rodriguez's problems with the

8    warrant, the responsibility was his after what you

9    had done?

10       A.   Back then, yes.

11       Q.   Why was that your understanding?

12       A.   That's, again, what I was given by the DA's

13   office and the clerk's office.

14       Q.   Okay.  And you had no other training or

15   information from LAPD.  Is that right?

16       A.   That's right.

17       Q.   Sorry.  Let me rephrase that.  You had no

18   other training from LAPD on whose responsibility it

19   was to correct the warrant than what you just

20   described.  Right?

21       A.   Can you ask me again, please.

22       Q.   Yeah.  I just realized I didn't ask it as

23   clearly as I could have before.

24            So you had no other training from LAPD on

25   whose responsibility it was to correct the warrant

Page 64

1    the photo in there.  Maybe they got it from a

2    different source.  I have no idea.

3        Q.   Okay.  I understand you are saying it's

4    theoretically possible it could come from somewhere

5    else.  Do you have reason to believe that's what

6    happened in this case?

7        A.   It's possible.  Again, I have -- I can't

8    say yes or no.  I don't know.

9        Q.   Okay.  But you don't have any reason to

10   think that occurred here.  Is that right?

11       A.   Sorry?  The question again?

12       Q.   What I'm asking is, do you have any

13   particular reason that the photo in this felony

14   warrant package would come from somewhere other than

15   the DMV?  Anything you can think of?

16       A.   No.

17       Q.   Okay.  All right.  Okay.  Give me one

18   moment here.

19           Did you -- create any other documents in

20   the case other than the notes that I showed you which

21   I think we labeled Exhibit 3?

22       A.   I don't recall.

23       Q.   So you have had this conversation with

24   Mr. Rodriguez.  When was the next time that you did

25   anything related to the warrant in this case?

                                          Page 69

1          A.    I would say about a year later.

2          Q.    Would that have been around October 2020?

3          A.    I'm not sure if it was 2020, October, or

4     maybe before then.

5          Q.    I apologize.  October 2019.

6          A.    2019.  I don't remember the date, but

7     possibly, yes.

8          Q.    Okay.  So what -- can you describe to me in

9     detail the next efforts you took, if any, to amend

10    the warrant.

11         A.    I went to the courthouse.  I met with the

12    judge.  I got the -- Mr. Rodriguez's name removed

13    from the arrest warrant system.

14         Q.    So what you mean is that's -- as distinct

15    from a judicial clearance letter, you actually had

16    his name removed from the warrant.  Right?

17         A.    Yes.

18         Q.    Okay.  How did you know to do that?

19         A.    I was provided the steps.

20         Q.    Who provided you the steps?

21         A.    I believe it was the clerk's office.  I

22    believe.  I don't remember.

23         Q.    Okay.  What were the steps?

24         A.    I don't remember the exact steps.  I know I

25    met with a judge.  I signed a document.  And I had to

                                                  Page 70

1   take it to the clerk's office.  I had to present the
2   application where it was removed from the system.
3        Q.   Okay.  And what documentation did you sign?
4        A.   I recall it was the warrant information
5   sheet.
6        Q.   Okay.  Anything else?
7        A.   That -- that's what I can remember.
8   Possibly documents, but that's all I can remember.
9        Q.   Okay.  And how did the clerk's office
10  explain this to you, that this was a required
11  process?
12            MR. HURRELL:  You mean what did they say?
13            MR. WASHINGTON:  Sorry.  I didn't hear
14  that.
15            MR. HURRELL:  You mean what did they say?
16            MR. WASHINGTON:  No.  I mean like
17  logistically, how did he get his information from the
18  clerk's office?
19            THE WITNESS:  Basically it was the
20  information I was given by -- a year prior when
21  Mr. Rodriguez had to go to the courts, meet with the
22  judge and get the letter.
23  BY MR. WASHINGTON:
24       Q.   Okay.  So you didn't find -- you didn't
25  file a warrant information sheet before.  Is that

Page 71

1    information sheet?

2        A.   I don't recall if I typed it in or wrote

3    it, handwritten.

4        Q.   Let me show you the warrant information

5    sheet here.  All right.  I'm going to share this with

6    you.

7            Is this the warrant information document

8    that you filled out?

9        A.   I believe so.

10       Q.   Okay.  For the record, this is JER-COLA 30

11   to 31.

12           Detective Perez, on the bottom right

13   corner, JER-COLA 30, do you know what that -- what

14   this signifies?  It looks like a signature or

15   scribble to me.  Do you know what that is?

16       A.   I don't know.  It looks like initials.  I

17   can't make that out.

18       Q.   Is it F -- do you know if it is FH?

19       A.   I don't.  I can't make that out.

20       Q.   Okay.  So this will be Exhibit 4.

21               (Exhibit 4 was marked for

22               identification and is attached

23               hereto.)

24   BY MR. WASHINGTON:

25       Q.   This looks to be typed in.  Was it you that

Page 75

1    established in this testimony.  You are arguing with

2    him.

3              MR. WASHINGTON:  Okay.

4        Q.   Do you recall telling internal affairs that

5    in 2018 you went to R and I?

6        A.   I don't recall.

7        Q.   So would that have been inaccurate if you

8    told them that?

9        A.   I don't recall if I did or not.

10       Q.   But I'm saying, would that fact if told to

11   IA be inaccurate?

12       A.   Again, I'm not sure if I called R and I

13   or -- I'm not sure whether I called them but I don't

14   think I went to them.

15       Q.   I'm asking if you spoke with them.

16       A.   With R and I?

17       Q.   Correct.  In 2018.

18       A.   Possibly did.  I don't recall if I spoke to

19   them.

20       Q.   Okay.  Do you have any -- well, hold on one

21   moment.

22              (Audio recording played.)

23   BY MR. WASHINGTON:

24       Q.   Okay.  So this is -- this is a recording

25   from your internal affairs investigation in which you

                                        Page 120

```
 1    said that before meeting with Juan Rodriguez in 2018

 2    you went to R and I.

 3              Does that refresh your recollection?

 4         A.   Yes.

 5         Q.   Okay.  Did you do that?

 6         A.   Yes, I did.

 7         Q.   So who did you speak to in R and I?

 8         A.   I don't remember.

 9         Q.   All right.  So information R and I told you

10    was that you needed to obtain a judicial clearance

11    form.  Is that right?

12         A.   As I recall, yes.

13         Q.   Did they tell you you needed any sort of

14    amendment?

15         A.   I don't remember.

16         Q.   So you don't recall them telling you to do

17    any other sort of amendment?

18         A.   No, I don't.

19         Q.   Okay.  All right.  Detective Perez, in

20    not -- in informing Mr. Rodriguez he needed a

21    judicial clearance form and then not updating his

22    warrant until -- well, scratch that.

23              You testified your understanding was that

24    your response -- you testified that your

25    understanding in 2018 was that your only
```

Page 121

```
 1   responsibility was to correct the -- was to inform

 2   Mr. Rodriguez that he could obtain the judicial

 3   clearance form. I'm sorry. I apologize. Let me

 4   just rephrase that.

 5           Your testimony was that in the situation

 6   here where Mr. Rodriguez had erroneous information in

 7   his warrant, your understanding of your

 8   responsibility at the time was that you needed to

 9   inform Mr. Rodriguez that he could obtain a judicial

10   clearance form but that was the end of your

11   responsibility. Correct?

12       A.   Yes.

13       Q.   Okay. Did you consciously violate LAPD

14   policies in this case?

15           MR. HURRELL: Objection. It's

16   argumentative. Vague and ambiguous.

17   BY MR. WASHINGTON:

18       Q.   You can answer.

19           MR. HURRELL: You can answer.

20           THE WITNESS: I don't know.

21   BY MR. WASHINGTON:

22       Q.   Well, I'm saying with respect to the

23   knowledge you had -- well, let me rephrase that.

24           So is it your understanding now that you

25   had more -- had other responsibilities to correct the
```

Page 122

1    warrant?

2         A.   Yes.  Now I do, yes.

3         Q.   Okay.  And how, excepting communications

4    with counsel, have you learned that to be your

5    responsibility?

6         A.   Can you rephrase that?

7         Q.   Sure.  I'm asking -- you say now that you

8    understand it was your responsibility to actually

9    amend the warrant.  Is that right?

10        A.   Yes.

11        Q.   How did -- how did you learn that other

12   than communications with your counsel?

13        A.   I am --

14        Q.   If it's only through communications with

15   your counsel, you can say I did not -- did not learn

16   it from another source.

17        A.   When I was going through the manual,

18   detective operations manual.

19        Q.   What in that manual informed you of this?

20        A.   There's a form you fill out to amend the

21   warrant.

22        Q.   Okay.  This is not something you have been

23   trained on.  Is that correct?

24        A.   I don't recall being trained on that, no.

25        Q.   Okay.  So I assume it's the same with your

Page 123

```
 1    training.  You have not trained other officers about

 2    this responsibility.

 3         A.   I haven't trained anybody on that, no.

 4         Q.   Are you -- were you aware of -- scratch

 5    that.

 6              Are you aware of other officers being

 7    trained on this?

 8         A.   Not aware.

 9         Q.   What sort of training do juvenile division

10    officers have with respect to properly inputting

11    information into a warrant?

12         A.   I don't know of any training that's offered

13    for that.

14         Q.   So is there -- is there any kind of

15    auditing process for the performance of officers or

16    detectives in the juvenile division?

17              MR. HURRELL:  What kind of process?

18              MR. WASHINGTON:  Auditing process.

19         Q.   How do you measure the performance of

20    officers in the juvenile division?

21         A.   They have annual ratings.

22         Q.   Does any part of that gauge the -- scratch

23    that.

24              Juvenile division is required to do due

25    diligence on warrants that it investigated.  Is that
```

Page 124

1    correct?

2        A.    Yes.

3        Q.    Okay.  Has that been the case since you

4    arrived at juvenile division?

5        A.    It might have been done before.

6        Q.    But so when you were there as well as

7    before.  Correct?

8        A.    Yes.

9        Q.    Was there any sort of monitoring system for

10   where -- as to whether due diligence was being done?

11       A.    Yes.

12       Q.    What was that?

13       A.    It was the due diligence, to check them

14   every month on warrants that are on the system.

15       Q.    Could you elaborate?  I'm not sure what you

16   mean by that.

17       A.    If there's warrants, there should be

18   warrants in the department system that's -- that are

19   outstanding warrants and they are checked every month

20   to see if they have been apprehended or cleared or

21   otherwise.

22       Q.    So you spoke about a due diligence

23   checklist before.  I think you said you didn't know

24   prior to this case that was a requirement.  Is that

25   accurate?

Page 125

```
 1        A.   Yes.

 2        Q.   Okay.  So there was no training on -- that

 3   you recall on due diligence?

 4        A.   No.

 5        Q.   Okay.  Is it your understanding now that --

 6   is it your understanding now that due diligence is

 7   supposed to be done annually?

 8        A.   Yes.

 9        Q.   So that would be going through the

10   checklist, right, annually?

11        A.   Yes.

12        Q.   Okay.  So from -- from what -- the records

13   I have, from 2017 to 20 -- sorry, from 2007 to 2014

14   there was no due diligence done on this warrant.  Do

15   you have anything -- do you have anything -- sorry.

16   Do you have any information suggesting that due

17   diligence was done during this time?

18             MR. HURRELL:  Objection.  There's no

19   foundation for this witness for that time period

20   because he wasn't involved.

21   BY MR. WASHINGTON:

22        Q.   You can answer.

23        A.   No.

24        Q.   Doesn't it strike you as an odd period of

25   time to have no due diligence?
```

Page 126

1          I, JARDENE L. PLATT, RPR, CSR No. 3724 in and

2     for the State of California, do hereby certify:

3          That prior to being examined, the witness named

4     in the foregoing deposition was by me duly sworn to

5     testify as to the truth, the whole truth, and nothing

6     but the truth.

7          That said deposition was taken before me at the

8     time and place therein set forth and was taken down by

9     me stenographically and thereafter transcribed via

10    computer-aided transcription under my direction and is

11    a true record of the testimony given, all done to the

12    best of my skill and ability.

13         Before completion of the deposition, review of

14    the transcript [XX] was [ ] was not requested.

15         I further certify that I am neither counsel for,

16    nor related to, any party to said action, nor

17    interested in the outcome thereof.

18         IN WITNESS WHEREOF, I have hereunto subscribed

19    my name.

20    Dated:  March 3, 2021

21

22    _____

23

24         JARDENE L. PLATT, RPR, CSR No. 3724

25

Page 153

# EXHIBIT 17(FILED UNDER SEAL)

# EXHIBIT 18(FILED UNDER SEAL)

# EXHIBIT 19

Paul Hoffman, SBN 071244
John C. Washington, SBN 315991
SCHONBRUN SEPLOW
HARRIS & HOFFMAN LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
Telephone: (310) 396-0731
Fax: (310) 399-7040
E-mails: hoffpaul@aol.com
          jwashington@sshhlaw.com

*Attorneys for Plaintiff*
*Juan Rodriguez*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN RODRIGUEZ,<br><br>       Plaintiff,<br><br>   v.<br><br>CITY OF LOS ANGELES, et al.<br>      Defendants. | Case No. 2:19-CV-03985-DMG-PJW<br><br>**PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS TO DEFENDANT CITY OF LOS ANGELES, GARCIA, PEREZ, BYRNE, AND CITY OF LOS ANGELES** |

      **PROPOUNDING PARTY:**     Plaintiff Juan E. Rodriguez

      **RESPONDING PARTIES:**    Defendant City of Los Angeles and Defendants Lugo, Byrne, Perez, and Garcia.

      **SET NO.:**            One

1

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

2

You are hereby requested, pursuant to Rule 36 Federal Rules of Civil Procedure,

3

to provide responses to the following Requests for Admission within 30 days, to

4

Schonbrun Seplow Harris Hoffman & Zeldes LLP, 200 Pier Avenue #226 Hermosa

5

Beach, California 90254.

6

7

## DEFINITIONS

8

The following definitions apply to each of the requests for documents set forth

9

herein and are deemed to be incorporated in each of said requests:

10

1.      The term "document" is used in the broadest possible sense and means

11

and includes, without limitation, any written, printed, typed, photocopied,

12

photographic, digital, electronic, recorded or otherwise reproduced communication

13

or representation, whether comprised of letters, words, numbers, pictures, sounds, or

14

symbols, or any combination thereof.  This definition includes copies or duplicates

15

of documents contemporaneously or subsequently created that have any non-

16

conforming notes or other markings.  Without limiting the generality of the

17

foregoing, the term "document" includes, but is not limited to, correspondence,

18

memoranda, notes, records, letters, envelopes, telegrams, messages, studies,

19

analyses, contracts, agreements, drafts, working papers, summaries, statistical

20

statements, financial statements or work papers, accounts, analytical records, reports

21

and/or summaries of investigations, trade letters, press releases, comparisons, books,

22

calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets,

23

circulars, bulletins, notices, drawings, diagrams, instructions, notes of minutes or

24

meetings, or other communications of any type, including, inter and intra-office

25

communications, questionnaires, surveys, charts, graphs, phonograph recordings,

26

films, tapes, videotapes, videos, discs, data cells, drums, print-outs, e-mails,

27

photographs, and all other data compilations from which information can be

28

obtained (translated, if necessary, into usable form), and any preliminary versions, drafts, or revisions of any of the foregoing.

2.    Usage of the singular shall include the plural and vice versa and the conjunctive shall include the disjunctive and vice versa.

3.    The term "any" refers to "all" and the term "all" shall include "any".

4.    "Communications" means any method of communication, including emails; letters; text messages; telephone messages; and electronic messages of any other sort, irrespective of a particular electronic means of distribution.  The term includes any transcription or memorialization of such communications.

7.    "YOU" and "YOUR" refer to the City of Los Angeles, Rosalie Garcia, Robert Lugo, Niall Byrne and/or Robert Perez. "YOU" and "YOUR" includes any present and former agencies, entities or subdivisions, and all present or former officers, directors, board members, employers, employees, attorneys, counsel, agents or other representatives, and any person in whole or in part acting on behalf of any of the foregoing.  As applied to the City of Los Angeles "YOU" and "YOUR" includes the Los Angeles Police Department.

8.    "LAPD" means the Los Angeles Police Department, and any present and former agencies, entities or subdivisions, and all present or former officers, directors, board members, employers, employees, attorneys, counsel, agents or other representatives, and any person in whole or in part acting on behalf of any of the Los Angeles Police Department.

11.    If no date is specified in a request referring to training, the request shall be understood to apply to training for LAPD employees employed from 1999 to 2020.

12.    If no date is specified in the request, and it refers to matters other than training, the request shall be understood 1999 to 2020.

13.    As used herein warrant "identifiers" means any identifying information

PLAINTIFF'S REQUESTS FOR ADMISSION

in a warrant or application therefor, including date of birth, driver's license, name or parts thereof, social security number, CII data, among others.

14.    WARRANTS FOR JUAN RODRIGUEZ's ARREST as used in these requests mean any warrants issued in Case No. BA214857, also known as warrant number LACBA21485701, including the warrant identified in Exhibit A to Plaintiff's First Set of Requests for Production, and any amended or subsequent warrant.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

Admit that the LAPD provided its officers no standardized training on how to ensure that identifying information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person.

**REQUEST FOR ADMISSION NO. 2:**

Admit that LAPD officers received no standardized training on how to ensure that the identifying information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the only training LAPD officers had, if any, on how to ensure that the identifying information the LAPD provides for an arrest warrant accurately identifies the suspect is whatever others chose to discuss with the officer.

**REQUEST FOR ADMISSION NO. 4:**

1       Admit that the LAPD has not required others, including its employees, to

2   provide LAPD officers any specific training concerning how to ensure that the

3   identifying information the LAPD provides for an arrest warrant accurately

4   identifies the suspect.

5

6   **REQUEST FOR ADMISSION NO. 5:**

7       If you deny the previous request, admit that the LAPD has not required

8   others, including LAPD employees,  to provide any specific training to LAPD

9   officers on how to ensure that the identifying information the LAPD provides for an

10  arrest warrant accurately identifies the suspect, other than informing the officer of

11  the material in JER-COLA 76-96.

12

13  **REQUEST FOR ADMISSION NO.  6:**

14      Admit that YOU have no document reflecting training for LAPD officers on

15  how to ensure that the identifying information the LAPD provides for an arrest

16  warrant accurately identifies the suspect, including where a suspect has a common

17  name or similar identifiers to another person.

18

19

20  **REQUEST FOR ADMISSION NO. 7:**

21      Admit that YOU have no document reflecting training for LAPD officers on

22  how to ensure an arrest warrant accurately identifies the suspect, including where a

23  suspect has a common name or similar identifiers to another person, other than the

24  documents produced to Plaintiff in this litigation.

25

26

27

28

**REQUEST FOR ADMISSION NO. 8:**

Admit that Defendant Garcia received no training concerning how to ensure that information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Detective Beardsley received no training concerning how to ensure that information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person.

**REQUEST FOR ADMISSION NO. 10:**

Admit that YOU have no documents reflecting any training received by Defendant Garcia concerning how to ensure that information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person.

**REQUEST FOR ADMISSION NO. 11:**

Admit that YOU have no documents reflecting any training received by Detective Beardsley concerning how to ensure that information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person.

PLAINTIFF'S REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 12:**

Admit that YOU have no documents reflecting any training received by Defendant Garcia on how to ensure that information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person, other than any document produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 13:**

Admit that YOU have no documents reflecting any training received by Detective Beardsley on how to ensure that information the LAPD provides for an arrest warrant accurately identifies the suspect, including where a suspect has a common name or similar identifiers to another person, other than any document produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 14:**

Admit that the LAPD provided its officers no standardized training on how to correct a warrant which may include identifying information for the wrong person.

**REQUEST FOR ADMISSION NO. 15:**

Admit that LAPD officers received no standardized training on how to correct a warrant which may include identifying information for the wrong person.

**REQUEST FOR ADMISSION NO. 16:**

Admit that the only training LAPD officers have had, if any, on how to correct a warrant which may include identifying information for the wrong person is whatever others choose to discuss with the officer.

PLAINTIFF'S REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 17:**

Admit that the LAPD does not require others to provide an officer any specific training concerning how to correct a warrant which may include identifying information for the wrong person.

**REQUEST FOR ADMISSION NO. 18:**

If you deny the previous request, admit that the LAPD does not require others to provide any specific training on how to correct a warrant which may include identifying information for the wrong person other than informing the officer of the material stated in JER-COLA 76-96.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU have no document reflecting training for LAPD officers on how to correct a warrant which may include identifying information for the wrong person.

**REQUEST FOR ADMISSION NO. 20:**

If you deny the previous request, admit that YOU have no document reflecting training for LAPD officers on how to correct a warrant which may include identifying information for the wrong person, other than documents produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 21:**

Admit that Defendant Garcia received no training concerning how to correct a warrant which may include identifying information for the wrong person, other than receiving the information in JER-COLA 76-96.

PLAINTIFF'S REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 22:**

Admit that Defendant Perez received no training concerning how to correct a warrant which may include identifying information for the wrong person, other than receiving the information in JER-COLA 76-96.

**REQUEST FOR ADMISSION NO. 23:**

Admit that Defendant Byrne received no training concerning how to correct a warrant which may include identifying information for the wrong person, other than receiving the information in JER-COLA 76-96.

**REQUEST FOR ADMISSION NO. 24:**

Admit that Defendant Lugo received no training concerning how to correct a warrant which may include identifying information for the wrong person, other than receiving the information in JER-COLA 76-96.

**REQUEST FOR ADMISSION NO. 25:**

Admit that Detective Lee (identified on JER-COLA 63) received no training concerning how to correct a warrant which may include identifying information for the wrong person, other than receiving the information in JER-COLA 76-96.

**REQUEST FOR ADMISSION NO. 26:**

Admit that Detective Monica Quijano received no training concerning how to correct a warrant which may include identifying information for the wrong person, other than receiving the information in JER-COLA 76-96.

**REQUEST FOR ADMISSION NO. 27:**

Admit that YOU have no documents reflecting any training received by Defendant Garcia concerning how to correct a warrant which may include identifying information for the wrong person, other than documents produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 28:**

Admit that YOU have no documents reflecting any training received by Defendant Perez concerning how to correct a warrant which may include identifying information for the wrong person, other than documents produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 29:**

Admit that YOU have no documents reflecting any training received by Defendant Byrne concerning how to correct a warrant which may include identifying information for the wrong person, other than documents produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 30:**

Admit that YOU have no documents reflecting any training received by Defendant Lugo concerning how to correct a warrant which may include identifying information for the wrong person, other than documents produced to Plaintiff in this litigation.

PLAINTIFF'S REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 31:**

Admit that YOU have no documents reflecting any training received by Detective Lee concerning how to correct a warrant which may include identifying information for the wrong person, other than documents produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 32**

Admit that YOU have no documents reflecting any training received by Detective Monica Quijano concerning how to correct a warrant which may include identifying information for the wrong person, other than documents produced to Plaintiff in this litigation.

**REQUEST FOR ADMISSION NO. 33:**

Admit that between 2012 and April 9, 2018, an LAPD employee caused the Countywide Warrant System ("CWS") data for Warrant Number LACBA21485701 to include a social security number of 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.

**REQUEST FOR ADMISSION NO. 34:**

Admit that the information most likely referenced to make the amendment described in Request No. 33 would have been Detective Lugo's due diligence investigation and accompanying documents.

**REQUEST FOR ADMISSION NO. 35:**

Admit that between 2012 and April 9, 2018, an LAPD employee did not cause the CWS data for Warrant Number LACBA21485701 to remove the California Operator's License Number associated with the warrant.

1    **REQUEST FOR ADMISSION NO.  36:**

2         Admit that between 2012 and April 9, 2018, an LAPD employee did not

3    cause the CWS data for Warrant Number LACBA21485701 to remove the name

4    "Esteban" associated with the warrant.

5

6    **REQUEST FOR ADMISSION NO.  37:**

7         Admit that there YOU have not sought an extradition warrant for the subject

8    of Warrant Number LACBA21485701 other than in 2007.

9

10   **REQUEST FOR ADMISSION NO.  38:**

11        Admit that YOU have no documents other than those produced to Plaintiff in

12   this litigation, related to YOUR investigation of the suspect currently identified in

13   Warrant Number LACBA21485701.

14

15        DATED: February 13, 2021          SCHONBRUN SEPLOW HARRIS

16                                          HOFFMAN & ZELDES LLP

17                                          _____

18                                          John Washington
                                            Paul Hoffman
19                                          Attorney for Plaintiff

20

21

22

23

24

25

26

27

28
                                          12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PROOF OF SERVICE
## UNITED STATES DISTRICT COURT

I am a resident of the county of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 11543 West Olympic Blvd., Los Angeles, CA 90064.

On February 13, 2021, I served the following document(s) described as:

**PLAINTIFF'S REQUESTS FOR ADMISSION**

on the interested parties in this action as follows:

| | |
|---|---|
| **Joseph Anthony Gordon**<br>**Eugene P. Ramirez**<br>Manning Kass Ellrod Ramirez and Trester LLP<br>801 South Figueroa Street Suite 15th Floor<br>Los Angeles, CA 90017<br>213-624-6900<br>jag@manningllp.com<br>epr@manningllp.com | **Thomas C Hurrell**<br>**Jessica You Lee**<br>**Karla Malagon**<br>Hurrell Cantrall LLP<br>300 South Grand Avenue Suite 1300<br>Los Angeles, CA 90071-3401<br>213-426-2000<br>213-426-2020 (fax)<br>thurrell@hurrellcantrall.com<br>jlee@hurrellcantrall.com<br>kmalagon@hurrellcantrall.com |

_X_ **[BY MAIL]** I caused such envelope to be deposited in the mail at Los Angeles, California.

The envelope was mailed with postage thereof fully paid.

_X_ **[FEDERAL]** I declare that I am employed in the office of a member of the bar of this

court at whose direction the service was made.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 13, 2021 at Los Angeles, California.

_____

John Washington

# EXHIBIT 20

# Schonbrun Seplow

# Harris Hoffman & Zeldes LLP

200 Pier Ave. #226
Hermosa Beach, CA 90254
(310) 396-0731 (310) 399-7040 (fax)
www.losangelesemploymentlawyer.com

Benjamin Schonbrun
Michael D. Seplow
Wilmer J. Harris
Paul L. Hoffman
Helen I. Zeldes
Aidan C. McGlaze
John C. Washington
Kristina A. Harootun
Ben Travis
Sarah L. Dawley

Of Counsel
Catherine E. Sweetser
Gary Bostwick
Erwin Chemerinsky*
*Illinois and Dist. Columbia

Culver City Office
9415 Culver Blvd. #115
Culver City, CA 90232

South Pasadena Office
715 Fremont Avenue
Suite A

South Pasadena, CA 91030
(626) 441-4129
(626) 283-5770 (fax)

May 20, 2021

**VIA E-MAIL**
Eugene Ramirez, epr@manningllp.com
Joseph Gordon, jag@manningllp.com
Thomas Hurrell, thurrell@hurrellcantrall.com
Jessica Lee, jlee@hurrellcantrall.com
Bradley Wilson, bwilson@hurrellcantrall.com

**Re:** *Rodriguez v. City of Los Angeles, et al.*

Dear Counsel:

I am writing to outline some of the discovery matters in the above-captioned case for us to discuss during our conference tomorrow. Many of these are the same matters raised in my May 14 letter. However, I have just received production from Defendants Lugo, Byrne and the City, because of which I am more specifically referring to some of these points.

As a preliminary matter the same concerns identified in the May 14 letter apply here. Defendants still appear not to have produced documents from an electronic search, as identified in the May 14 letter and as we've discussed before by phone. A search for these documents is patently requested, required, and there has been ample time to perform it. Defendants have still failed to produce instances of erroneous warrants and incidents similar to Plaintiffs and related documents such as audits, complaints or investigations concerning the same, and have failed to provide personnel records for officers Defendants Perez, Garcia, Byrne, Lugo, and other officers involved in this case. (*E.g.* Third Set of Requests for Production Nos. 13-17, 19).

For reasons addressed previously, the privileges and objections asserted do not permit withholding the documents; in addition to which, any such objections are waived given the

May 14, 2021
Page 2 of 4

failure to timely asserting any of them.  *See, e.g., Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ("It is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection.").

The interrogatories, for example Interrogatory Number 9, also request that you "specifically identify and describe in detail" additional training pertaining to warrants that you contend was received.  Defendants' Responses are inadequate and do not do so.  For example, Defendants avoid their discovery obligations by responding with statements like "the issuance of warrants is covered."

The objections to the requests and partial answers are inadequate.  Initially, it is well established that the requests are deemed admitted absent timely service of responses.  *See* Fed. R. Civ. Procedure 36(a)(3).  Even apart from this, several of the Responses to the Requests for Admission state that the Defendant is unable to answer, and offer no explanation.  *E.g.* RFA No. 38.  There is no reason the Defendant cannot admit or deny many of these requests.  *E.g. Id.* Furthermore, the requests for admission do not provide any reason for which Defendants are purportedly unable to admit or deny, in violation of the Federal Rules.  *See* Fed. R. Civ. P. 36(a)(4) ("If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it.").

In their responses, Defendants often state that they allegedly possess documents concerning relevant training in this case which they have not produced, for example in responses to Requests for Admission No. 20, 24, 29, and 30.  The time for production has passed and Defendants have had ample time to produce any such purported documents and still have not done so, despite discovery coming to a close.  Please be advised that should Defendants attempt to introduce any additional documents or evidence pertaining to training, Plaintiff will move to exclude it from trial.

Lastly, Defendant City of Los Angeles has not provided objections or responses to Plaintiff's most recent interrogatories, or requests for admission despite significant time to do so. The requests for admission are deemed admitted, and the production outstanding.  In light of this and the above, to the extent necessary, Plaintiff will move to seek the Court's assistance to

May 14, 2021
Page 3 of 4

address Defendants' outstanding production.  I hope we can discuss these matters more fully

tomorrow, and avoid intervention of the court to the extent possible.


Sincerely,

John Washington
SCHONBRUN SEPLOW
HARRIS & HOFFMAN & ZELDES LLP

# EXHIBIT 21

# SCHONBRUN SEPLOW
# HARRIS & HOFFMAN LLP

200 Pier Avenue, Suite 226
Hermosa Beach, CA 90254
(310) 396-0731   (310) 399-7040 (fax)
www.sshhlaw.com

Benjamin Schonbrun
Michael D. Seplow
Wilmer J. Harris
Paul L. Hoffman
Catherine E. Sweetser
Aidan C. McGlaze
Colleen M. Mullen
John C. Washington
Stephanie Yu

Of Counsel
Erwin Chemerinsky
*Illinois and Dist. Columbia

West Los Angeles Office
11543 W. Olympic Blvd.
Los Angeles, CA 90064
(310) 396-0731
(310) 399-7040 (fax)

South Pasadena Office
715 Fremont Avenue, Suite A
South Pasadena, CA 91030
(626) 441-4129
(626) 283-5770 (fax)

August 2, 2018

**VIA U.S. MAIL ONLY**

R & I Watch Commander's Office, Los Angeles Police Department
Administration Building
100 West 1st Street, Room P1-137
Los Angeles, CA 90012

CC:    Detective Robert Perez, Juvenile Division
       Detective Niall Byrne

*Re:*    **Erroneous Arrest Warrant for Juan Esteban Rodriguez**

To Whom It May Concern at the Los Angeles Police Department:

I am writing to inform you of an erroneous arrest warrant for which our client, Mr. Juan Esteban Rodriguez, was arrested on April 9, 2018 so that the LAPD can take the necessary steps to ensure that he is not arrested erroneously again.

In the early morning of April 9, 2018 officers from the LAPD Narcotics and Juvenile Divisions raided Juan Esteban Rodriguez's home at 5953 Lorelei Avenue, Lakewood, CA 90712.  He was handcuffed in front of his wife and outside his newly-bought home in front of his neighbors.  The basis for this raid appears to have been a warrant, number **LACBA 21485701 (Report Number DR #00-11-19771)**.  The warrant does not apply to Juan Esteban Rodriguez.  He has committed no crime and was arrested without justification. It is our understanding from Detective Byrne (see attached photographs of Detective Byrne's business card) that the LAPD's Juvenile Division is doing follow up work on the issue, but our client has not heard anything further from the LAPD.

It appears that the intended target of the raid is a man who shares a birthday and portions of his name with Juan Esteban Rodriguez. We believe that man to be Juan

Pl. 000055

Ramon Rodriguez Rivera, a known sex criminal who was arrested and incarcerated over a year ago in Florida.  We have attached to this letter documents identifying this man and indicating his incarceration.  The LAPD should be able to verify this information and take whatever action is necessary to remove the warrant from the system.  The person it appears the LAPD intended to arrest, as noted in greater detail in the attached is as follows:

**JUAN RAMON RODRIGUEZ RIVERA**
Dept. of Correction #U57299 | DOB: 01/05/1975 | Height 5"05"
Columbia Correctional Institution
216 S.E. Corrections Way
Lake City, Florida 32025-2013
Tel (386) 754-7600
Fax (386) 754-1632
columbiaci@mail.dc.state.fl.us
Warden:  John Godwin | John.Godwin@fdc.myflorida.com

Our client Juan Esteban Rodriguez is not the subject of any criminal charges, as the LAPD has been informed of and has verified prior to his arrest.  The 2018 incident may have its origins in an incident in 2007 or earlier which involves a different person, Juan Ramon Rodriguez Rivera.  In or about late August of 2007, our client's father spoke with Detective Robert Lugo of the LAPD Juvenile Division, Serial Number 35316, to ensure that his son would not be erroneously targeted for arrest.  Our client called Mr. Lugo on or about the first week of September 2007, to provide his social security number and explain his whereabouts and actions in the summer of 2000 to facilitate this process.  Mr. Lugo assured our client Juan Esteban Rodriguez he would be eliminated and removed from any warrant database so that incidents like the April 2018 arrest would not happen.

The raid and arrest were very frightening and humiliating and our client fears it may happen again; particularly as he believed this matter had been resolved more than a decade ago.  We urgently request that the LAPD take any steps necessary to ensure Juan Esteban Rodriguez is not arrested again, including that it: (1) expunge the inaccurate warrant; (2) remove or update any identifiers tending to indicate that Juan Esteban Rodriguez is whomever the LAPD intended to arrest on April 9; and (3) add clear indications that future associations between Juan Esteban Rodriguez and whomever the LAPD intended to arrest – or any other suspected criminal with a similar name or birthdate – would be inaccurate.  If there are additional effective steps we urge that they be taken.

Moreover, if there is a California Information and Identification ("CII") number, an FBI number, a California Department of Corrections and Rehabilitation ("CDC") number, or any other identifier wrongly associated with Juan Esteban Rodriguez, we request that such identifier be removed or updated.  If any other error contributed to this arrest, we ask that it be addressed as well.  If it helps in identifying the error(s), Juan

Pl. 000056

Esteban Rodriguez's DMV Records were apparently transposed onto the warrant, which bore a different social security number.

The person for whom the warrant was intended has a different name; was a different height; has facial scars (our client does not); has a different social security number and had additional other identifiers such as a different residence, his place of incarceration. Such information was evidently insufficient to prevent the arrest of our client, and so we specifically request that the LAPD not rely on this information again for arresting Juan Esteban Rodriguez, and that the LAPD update whatever identifiers and/or policies led to our client's arrest. Please provide us confirmation and evidence that these steps have been taken particularly as prior assurances from the LAPD were insufficient or inaccurate.

If any more action is necessary on the part of our client or myself, please let me know. We would be happy to provide more information if helpful. We appreciate your prompt response.

Sincerely,

SCHONBRUN SEPLOW
HARRIS & HOFFMAN LLP

Paul L. Hoffman
John Washington

*Enclosures*:
Photographs of business card with handwritten notes from LAPD Det. Niall Byrne
Documents identifying potential warrant target Juan Ramon Rodriguez Rivera

Pl. 000057

# EXHIBIT 22

# SCHONBRUN SEPLOW
# HARRIS & HOFFMAN LLP

200 Pier Avenue, Suite 226
Hermosa Beach, CA 90254
(310) 396-0731   (310) 399-7040 (fax)
www.sshhlaw.com

Benjamin Schonbrun
Michael D. Seplow
Wilmer J. Harris
Paul L. Hoffman
Catherine E. Sweetser
Aidan C. McGlaze
Colleen M. Mullen
John C. Washington
Stephanie Yu

Of Counsel
Erwin Chemerinsky
*Illinois and Dist. Columbia

South Pasadena Office
715 Fremont Avenue
Suite A
South Pasadena, CA 91030
(626) 441-4129
(626) 283-5770 (fax)

October 4, 2018

**VIA U.S. MAIL ONLY**

Office of the City Clerk
200 N. Spring St.
Room 395, City Hall
Los Angeles, CA 90012

*Re:*   **ATTACHMENT A TO CITY CLAIM FORM FOR JUAN ESTEBAN
RODRIGUEZ**

To Whom It May Concern:

This letter constitutes a claim for damages pursuant to California Government
Code § 910 *et seq.*, for injuries sustained by Juan Esteban Rodriguez arising out of
violations of statutory, common law, and constitutional rights as set forth below. **This
claim is made against the City of Los Angeles.**

## I.   NAME AND MAILING ADDRESS OF CLAIMANT JUAN ESTEBAN
RODRIGUEZ

Juan Esteban Rodriguez, 5953 Lorelei Avenue, Lakewood, CA 90712. He is
currently a Senior Manager at The Walt Disney Company.

## II. ADDRESS TO WHICH NOTICES SHOULD BE SENT

All correspondence related to this matter should be addressed to Paul Hoffman,
Schonbrun Seplow Harris & Hoffman LLP 200 Pier Avenue Suite 226, Los Angeles, CA
90291.
//
//
//
//

**Pl. 000037**

Attachment A to City Claim Form for Juan Esteban Rodriguez
Page 2 of 5

## III.    HOW DAMAGES OR INJURIES OCCURRED

This incident involves the City of Los Angeles' ("City") and its LAPD officers' false arrest and imprisonment, and unreasonable search and seizure of Juan Esteban Rodriguez pursuant to an erroneous warrant for a clearly different person after Juan Esteban Rodriguez had already clarified with the LAPD he was not that person in 2007.

In or about late August of 2007, Juan Esteban Rodriguez's father was contacted by Detective Robert Lugo of the LAPD, who Juan Esteban Rodriguez believe to have been with the Juvenile Division and to have had the serial number 35316. Juan Esteban Rodriguez's father did so to address the LAPD's questions regarding his son and clarify that his son was not the proper subject of a warrant which the LAPD appeared to have.

Juan Esteban Rodriguez called Detective Lugo on or about the first week of September 2007, to provide his social security number and explain his whereabouts and actions in the summer of 2000 as requested by Detective Lugo, and that he was graduating law school at that time, to further show he was not the person the warrant sought. Detective Lugo assured Juan Esteban Rodriguez that he had been eliminated as a suspect and removed from a national warrant database so that he would not be wrongfully arrested.

The LAPD did not appear to take any reasonable and necessary steps to ensure Juan Esteban Rodriguez would not be falsely arrested. Instead a warrant or warrants were associated with Juan Esteban Rodriguez and he was wrongfully arrested by the LAPD. The Gang and Narcotics divisions of the LAPD circled Juan Esteban Rodriguez's house in the early morning of April 9, 2018 with guns drawn as Juan Esteban Rodriguez slept. They arrested and handcuffed Juan Esteban Rodriguez in front of his wife and brought him handcuffed outside his newly-bought home out in plain sight from his neighbors' homes.

The intended target of the raid and the warrant from 2007 was for another man. That man seems to be Juan Ramon Rodriguez Rivera a known criminal, whose only commonality with Juan Esteban Rodriguez is that they share portions of their name – "Juan" and "Rodriguez" – and a birthday. Juan Ramon Rodriguez Rivera was incarcerated at the time of the arrest of our client and had been for approximately a year before April 9, 2018. This information was easily accessible to the LAPD, and indeed Juan Rodriguez discovered this information himself within a matter of seconds when he searched on Google. Moreover, Juan Ramon Rodriguez Rivera and Juan Esteban Rodriguez are otherwise obviously different people: the former is approximately five inches shorter than the latter, has scars on both sides of his face (Juan Esteban Rodriguez does not have such scars), and has a different social security number. Juan Esteban Rodriguez's social security number is from the Connecticut area.

Notwithstanding the dissimilarities between the two men an officer insisted that Juan Esteban Rodriguez too had multiple facial scars, which he clearly does not, and

Pl. 000038

Page ID #:2741

Attachment A to City Claim Form for Juan Esteban Rodriguez
Page 3 of 5

should remain arrested. Juan Esteban Rodriguez was only released from custody after he showed officers his social security card and passport, and that the social security number on the warrant was not his; which should have been obvious to the LAPD and which he had expressly explained to them previously.

Juan Esteban Rodriguez understands the warrant for his arrest was number LACBA 21485701 (Report Number DR #00-11-19771). The warrant clearly should not apply to him. He has committed no crime. Some of Juan Esteban Rodriguez's information, such as his address and photograph from the Department of Motor Vehicles, had been transposed on the warrant, though someone else's social security number appeared on the warrant.

The LAPD Gang and Narcotics Unit's arrest of Juan Esteban Rodriguez, and his handcuffing and detention was frightening, humiliating, degrading, extremely stressful, and traumatizing. It was also avoidable and unnecessary, particularly given that Juan Esteban Rodriguez had already clarified he was not the proper suspect years prior.

## IV.    WHEN DAMAGES OR INJURIES OCCURRED

The events responsible for Juan Esteban Rodriguez's injuries occurred on the morning of April 9, 2018.

## V.    WHERE DAMAGES OR INJURIES OCCURRED

The events responsible for Juan Esteban Rodriguez's damages or injuries occurred in and around his home at 5953 Lorelei Avenue, Lakewood, CA 90712.

## VI.    ACTS OR OMISSIONS CAUSING INJURIES

The acts or omissions causing the injuries are detailed above. They include the unreasonable search and seizure of Juan Esteban Rodriguez and his false arrest and imprisonment.

The LAPD created and executed a warrant for Juan Esteban Rodriguez's arrest on the basis that parts of his name were "Juan" and "Rodriguez", and that he shared a birthday with the intended target whose name included these. The LAPD did so notwithstanding the person appears to have been imprisoned at the time, and Juan Esteban Rodriguez had numerous other distinguishing identifiers such as his social security number, height, address, and appearance. Moreover the LAPD arrested Juan Esteban Rodriguez at his home with guns drawn after he had already explicitly indicated he was not the proper target of one of their warrants. There was no probable cause for the LAPD to arrest Juan Esteban Rodriguez and he committed no crime.

The City of Los Angeles has a custom and policy of inputting and retaining warrant data in a manner which leads to such erroneous arrests including for persons who share parts of their name and a birthdate. The City also fails to train its officers to

Pl. 000039

Attachment A to City Claim Form for Juan Esteban Rodriguez
Page 4 of 5

properly prepare, verify, or correct arrest warrants, and does not supervise, discipline, or hire officers in any way to ensure warrants are properly prepared, verified and corrected.

## VII.    NAMES OF PERSONS CAUSING INJURIES

Detective Niall Byrne and approximately four other officers, whose names are unknown to Juan Esteban Rodriguez at this time, participated in his arrest. Detectives Robert Perez and Robert Lugo may have contributed to Juan Esteban Rodriguez's injuries. The other names of the persons causing injuries are unknown to Juan Esteban Rodriguez at this time.

## VIII.    NAMES AND ADDRESSES OF WITNESSES, DOCTORS, AND HOSPITALS.

- **Detective Niall Byrne,** Los Angeles Police Department Gang and Narcotics Division.
- **Detective Robert Perez,** Los Angeles Police Department Juvenile Division.
- **Detective Robert Lugo,** Los Angeles Police Department, who is possibly retired and formerly with the LAPD Juvenile Division.
- **Marisela Cervantes,** 5953 Lorelei Avenue, Lakewood, CA 90712.
- **Juan Esteban Rodriguez,** 5953 Lorelei Avenue, Lakewood, CA 90712.
- **Approximately four other unnamed officers.**

## IX.    DAMAGES OF INJURIES.

As a direct and proximate result of the wrongful acts alleged above, Juan Esteban Rodriguez has suffered emotional distress, including humiliation, shame, and a persistent anxiety that he may be arrested in his home or elsewhere at any given time.

Juan Esteban Rodriguez has also suffered damages in the form of the legal fees he has incurred. He has hired attorneys to communicate with the LAPD to ensure he is no longer associated with the LAPD's erroneous warrants and that he has some substantiated assurances that steps have been taken to ensure he will not be falsely arrested ever again. His lawyers have sent a letter to the LAPD requesting these steps, which is attached to this submission, and the LAPD has ignored it to date.

## X.    AMOUNT OF DAMAGES

The amount of damages would not qualify as a limited civil case. Juan Esteban Rodriguez has suffered substantial emotional distress as a result of the events described in this claim. Among other things he has a persistent fear that he may have his home invaded or be arrested by armed officers at any time and any place and if he tries to travel.

Pl. 000040

Attachment A to City Claim Form for Juan Esteban Rodriguez
Page 5 of 5

      Juan Esteban Rodriguez's emotional distress has been exacerbated by the LAPD's refusal to inform him whether he has been disassociated with the erroneous warrant and to provide substantiated assurances that he will not be wrongfully arrested again.

## XI.  INSURANCE PAYMENTS

Juan Esteban Rodriguez has not received any compensation from his insurance for these injuries.

Should you have any questions as to any of the foregoing, please do not hesitate to contact me.

          Sincerely,

          SCHONBRUN SEPLOW
          HARRIS & HOFFMAN LLP

          _____
          Paul L. Hoffman
          John Washington
          Attorneys for Claimant Juan Rodriguez

Enclosure: Letter from Paul Hoffman to the LAPD Dated August 2, 2018.

**Pl. 000041**